415 F.2d 922
 134 U.S.App.D.C. 342
 Richard A. WILLIAMS and Alfred S. Trask, Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
D.C. Transit System, Inc., Intervenor.
DEMOCRATIC CENTRAL COMMITTEE OF the DISTRICT OF COLUMBIA,
Leonard N. Bebchick and Daniel W. Gottlieb, Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
D.C. Transit System, Inc., Intervenor.
D.C. TRANSIT SYSTEM, INC., Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.
 Nos. 20200, 20201, 20202.
 United States Court of Appeals District of Columbia Circuit.
 Argued Feb. 21, 1967.
Decided Oct. 8, 1968, Certiorari Denied Feb. 24, 1969, See
89 S.Ct. 860.
 
 Mr. Leonard N. Bebchick, Washington, D.C., with whom Mr. Stanley O. Sher, Washington, D.C., was on the brief, for petitioners in Nos. 20,200 and 20,201.
 Mr. Harvey Mr. Spear, New York City, with whom Mr. Edmund L. Jones, Washington, D.C., was on the brief, for petitioner in No. 20,202 and intervenor in Nos. 20,200 and 20,201.
 Mr. Russell W. Cunningham, Arlington, Va., for respondent.
 Before BAZELON, Chief Judge, FAHY,* DANAHER, BURGER, WRIGHT, MCGOWAN, TAMM and ROBINSON, Circuit Judges, sitting en banc.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 In D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission (Transit I),[1] we reviewed the Commission's Order No. 245,[2] promulgated after a public hearing in 1963, by which Transit was authorized to raise its token fare for passenger transportation within the District of Columbia and between the District and points in Maryland.[3] We then resolved several subsidiary issues germinated by that order, but were unable to pass judgment as to the legal propriety of the fare increase. The order in that aspect was predicated upon the Commission's finding that a margin of return of $1,480,746, representing a 4.87% Rate of return on Transit's operating revenues, was just and reasonable.[4] Upon examination of the record, however, we discovered that we had 'no intelligible basis for disposing of the competing claims before us that the return allowed by the Commission is, on the one hand, too high, and, on the other, too low.'[5] Accordingly, we remanded the case to the Commission 'for further proceedings * * * to determine the margin of return over and above operating expenses that Transit should be allowed.'[6]
 
 
 2
 On September 17, 1965, shortly before our remanding order was certified to the Commission, Transit filed a new tariff making numerous fare changes for 1966,[7] including elevations in the District cash fare from 25 to 30 cents, and in the District token fare from 21.25 to 25 cents.[8] Exerting a power conferred by the Washington Metropolitan Area Transit Regulation Compact (Compact),[9] the Commission promptly suspended the new tariff pending a determination as to its reasonableness, and thereafter conducted a public hearing on the proposals it contained.
 
 
 3
 On January 26, 1966, in purported response to our remand, and without prior notice or further hearing for the purpose, the Commission entered Order No. 563,[10] in supplementation of Order No. 245, reaffirming the return for 1963 the latter had previously allowed.[11] It simultaneously issued Order No. 564,[12] in which it found that a margin of return for 1966 of about $2,000,000 above operating revenues, symbolizing a return rate of 6.03%, would be fair and reasonable,[13] but that the existing fare scale would generate net earnings estimated at only $648,357.[14] The Commission nonetheless felt that a fare increase, save in a minor respect not questioned here, was unnecessary because of the availability of $2,166,933 in a special reserve which had been created in consequence of our decision in Bebchick v. Public Utilities Commission.[15] In lieu of an increase, the Commission permitted Transit to draw upon the reserve for approximately $1,350,000 to accommodate the anticipated deficit in its earnings.[16]
 
 
 4
 Timely petitions for rehearing,[17] denied by the Commission, ripened for our present review[18] various issues stemming from these orders.[19] No. 20,200 brings contentions that Order No. 563 is invalid for lack of notice and hearing, and is erroneous on the merits. No. 20,201 presents importantly the claim that the margin of return awarded by Order No. 564 is unreasonable, and it, like No. 20,202, includes attacks upon other Commission findings and conclusions. We proceed now to a consideration of the problems thus engendered, in the sequence[20] we deem best suited to exposition of the reasons for which we set each of the Commission's orders aside.
 
 
 5
 * 1963 MARGIN OF RETURN
 
 
 6
 Following our remand, the Commission promulgated in Order No. 563 its supplemental findings to Order No. 245, and 'affirmed' its earlier finding that a margin of return representing a rate of 4.87% On operating revenues 'was fair and reasonable.'[21] Petitioners in No. 20,200 attack Order No. 563 on the ground that it does not comply with our instructions governing the Commission's task on remand.[22] The disclosures made by the record, now to be delineated, lead us to agree.
 
 
 7
 We pointed out in Transit I that the return of 4.87% Possesses no inherent validity, and voiced our 'need to know more than we have been told about why the Commission thought this was the appropriate margin.'[23] We observed that the margin of return properly allowable over legitimate operating expenses is 'the sum of money needed to attract the capital, both debt and equity, required to insure financial stability and the resulting capacity of the utility to render the service upon which the public depends.'[24] And we stressed the necessity for
 
 
 8
 'inquiries and findings-- judgmental as the latter may often be because ratemakers must be prophets of the future as well as historians of the past-- into such things as the capital programs in prospect, what such programs entail in terms of down-payments as well as financing, the cost of borrowing money, working capital needs, the desirable ratio of debt to equity, the incentives required by a stockholder to keep his money in the business and the dividends and growth rates requisite to supply these incentives, the opportunities in these respects provided in comparable businesses, and the related matters which must be prayerfully explored by the conscientious regulator before he can begin to say why he fixed upon 4.87 rather than 6.5 or 3.2.'[25]
 
 
 9
 Despite these explicit guidelines, we search in vain the Commission's supplemental opinion for the vital findings, or for any manifestation that the Commission has made the inquiries referred to.
 
 
 10
 The bulk of Order No. 563 is devoted to a summary of the testimony of various witnesses given during the 1963 hearing. The summary covers such matters as Transit's rate base; the capital structures of Transit and other utilities; Transit's cost of capital and that of other utilities; the degree of risk borne by Transit shareholders, as compared with other regulated utilities; dividends and earnings of Transit and its parent,[26] and those of other utilities; Transit's estimated debt expense for the future annual period; actual and authorized operating ratios of Transit and other utilities; and the average market prices of the stock of Transit's parent. Having thus reviewed the record in somewhat greater detail than in its original order, the Commission then simply reaffirmed its earlier conclusion on the rate of return in language strikingly reminiscent of that which when remanding we had characterized as 'stock generalizations which serve only to frustrate, rather than illuminate, judicial review:'[27]
 
 
 11
 'We have before us then an abundance of testimony relating to returns authorized and/or earned by transit companies, telephone companies, electric companies, and gas companies. This information allows us to examine earnings on investments carrying, to some degree, a comparable risk, and are of some value when considered in relation to this particular company. No single rate of return is universally applicable to all transit companies in the United States. A fair rate of return varies with the times and conditions of a particular company as these conditions and opportunities exist at the time of the weighing of the facts in the making of a determination. What constitutes a reasonable rate of return is a question of fact, the solution of which calls for the exercise of sound judgment and common sense by the Commission.
 
 
 12
 'We have weighed very carefully all testimony and exhibits in this proceeding, along with supplemental data where noted. We are of the opinion that fares producing an operating ratio in the range of 95 to 95.5 constituted a fair and proper return. The projected net operating income of $1,480,000 was the amount necessary to enable Transit to service its debt, pay reasonable dividends, retain a reasonable portion in its business, and to attract investments of private investors. It was, in addition, the amount necessary to maintain investor confidence and to protect the company from the risks peculiar to the transit industry and to Transit itself.'[28]
 
 Dividend Payout
 
 13
 The Commission's opinion is almost wholly devoid of any indication of the method by which it calculated that a margin of return of $1,480,000 was fair and reasonable. The Commission did account for a portion of that sum by finding that a dividend payout of $500,000 would be reasonable-- apparently in response to our observation that 'Transit's annual dividend pay-out of about $500,000 appears to have been treated as if it were a cost of operation, like the annual expenditure for gas and oil, with no examination of, or conclusion about, its appropriateness.'[29] Our concern, however, is hardly alleviated by the Commission's treatment of this point on remand:
 
 
 14
 'While there was no direct testimony as to the dollar amount required to be available for dividends, the record does show that $500,000 has been paid out annually over past years to the investors. In view of the fact that in the past three years the market price of the parent company has been relatively stable, it appears to us that the margin of profit allowed by the Commission was fair and reasonable to both the investor and the consumer.'[30]
 
 
 15
 The Commission's stock price stability theory cannot survive close scrutiny. A stable market price could indicate that a constant dividend yield has been consistently too high or too low, as well as that it has been fair and reasonable.[31] Moreover, the theory finds little support in the record,[32] and we have been referred to no authority buttressing the validity of this method of establishing the appropriateness of a dividend.[33] Thus we are left, as before, without an acceptable rationale for a dividend payout of $500,000, but only the fact that over a period of years Transit has paid annual dividends in that sum.
 
 Return on Rate Base
 
 16
 The Commission's ratemaking responsibilities are by no means exhausted by any determination it may make as to a fair dividend.[34] Even were we able to sustain the Commission in that regard, we would not be enabled thereby to affirm the Commission's allowance of a total return of $1,480,000. What is needed is a reasoned justification of the end result-- the entire excess of gross operating revenues allowed over operating expenses. Here, however, the Commission does not provide any suitable explanation of or support for its ultimate conclusion that a margin of return of $1,480,000 is fair and reasonable. Save for its verdict with respect to the dividend payout, the only concrete finding that the Commission made is that the authorized margin of return would be equivalent to a return on rate base of approximately 6 1/2%.[35] We express no view on the reasonableness of such a return on rate base, nor on the accuracy of the Commission's statement that such a return is 'conservative.'[36] We do stress, as we did in our former opinion, that testing the reasonableness of an operating ratio by reference to the return on rate base, while sometimes useful, 'can never be conclusive. The important thing is not that the result reached by the operating ratio method be compared with that which would have been reached under some other method, but that the operating ratio method be applied rationally and intelligibly in the first instance.'[37] Absent a calculation of operating ratio responsive to the considerations enumerated in our opinion remanding the Commission's reference to return on rate base could not provide independent support for the result it reached.
 
 Costs of Capital
 
 17
 On our prior review, we took note of the Supreme Court's statement in FPC v. Hope Natural Gas Co.[38] that 'in balancing investor and consumer interests, it is essential to consider the capital costs of the enterprise.'[39] We emphasized that the operating ratio method does not make an inquiry into capital costs irrelevant, and that indeed 'it was in part the failure of rates established by the rate base method to cover the capital costs of most motor carriers' that gave birth to the operating ratio method.[40]
 
 
 18
 During the course of the 1963 hearing, both Transit and the protestants[41] submitted evidence relating to Transit's cost of capital. Transit's expert witness testified to a combined cost of debt and equity capital for Transit of 7.8%, derived from industry averages.[42] He stated further that this figure could not itself be taken to represent a fair return, but would have to be adjusted upward, to about 10%, to allow for a reasonable addition to surplus.[43] The 10%, he said, could be applied to the 'physical value of the plant that is devoted to public service' in order to determine a fair return.
 
 
 19
 Protestants' expert recommended that Transit be permitted to earn gross revenues sufficient to provide a return on its equity capital of 12% After allowing for operating expenses and interest on its debt. He reached this figure after study of the earnings-price ratios of Transit's corporate parent[44] and 12 urban transit companies that he felt were 'most comparable' to Transit. Over the ten-year period from 1952 through 1961, he found, the average of the 12 companies was approximately 11%. This he increased to 12% To compensate for the increased risk borne by Transit's shareholders emanating from Transit's abnormally high debt-equity ratio.[45] He stated that the 12% Could be applied to Transit's average book equity for 1963 in order to provide a fair return on equity.[46] He then added the resulting figure to Transit's estimated debt expense for the test period, and arrived at a sum which he felt should be allowed as the margin of return over operating expenses.[47]
 
 
 20
 The Commission made no findings based on any of this evidence, and did not analyze the cost of capital testimony of Transit's expert witness. With respect to the testimony of protestants' expert, the Commission had only this to say:
 
 
 21
 'Moreover, we have considered but placed little emphasis on protestant's recommended rate of return utilizing the cost-of-capital method. It should be noted that more traditionally the computation of the cost of capital is done by determining the cost of debt and of equity and weighting the two for a composite rate. The protestants in this case disregarded this traditional method. We feel that the cost-of-capital method utilized is inappropriate in determining a proper rate of return for a transit company. Our view is reinforced when we consider the capital structure of this particular company. Other factors in addition to cost of capital should be considered in making the return allowance. These additional factors include the degree of risk involved, a comparison of earnings, the ability to attract capital, the economic conditions of both the market place and the community, the efficiency of management, and the contribution to surplus. We have seen that the recommendation of the protestant's expert witness is based not on a mathematical formula but a weighting of any judgmental factors. Thus, the 'judgment' factors tend to undermine the objectivity of the end results. This is especially true when the answers given by the witness on his cross-examination are compared with his direct testimony.'[48]
 
 
 22
 We are unable to understand the Commission's failure to make findings on the critical cost of capital factor. Nor are we persuaded by its stated reason for rejecting the approach taken by protestants' expert.
 
 
 23
 In the first place, that protestants' expert 'disregarded' the 'traditional method' and testified to a cost of equity capital, rather than an overall or combined cost of capital, does not appear to us to deprive his testimony of utility. The witness explained why he talked in terms of a cost of equity capital: 'I do not employ a composite rate of return, as I believe that my method of allowing the actual interest expenses, and a determination of the return on the actual equity investment is simpler and gives approximately the same result.' Had the Commission desired, the protestants' figure for cost of equity capital could have been transformed quite easily into a figure representing a combined cost of debt and equity capital.[49] As we have noted, Transit's witness did testify to an overall cost of capital.[50]
 
 
 24
 We are also puzzled by the Commission's statement that 'the cost of capital method * * * is inappropriate in determining a proper rate of return for a transit company,' and we do not understand how this view is 'reinforced' by reference to 'the capital structure of this particular company.' Indeed, it is difficult to see how else the Commission could hope to determine 'the sum of money needed to attract the capital, both debt and equity, required to insure financial stability' than through an analysis of the sort proposed by the two expert witnesses.[51] And though Transit's unusual capital structure may have a bearing on its costs of acquiring debt and equity capital,[52] it is unclear why that factor precludes ascertainment and consideration of such costs at all.[53]
 
 Comparable Earnings
 
 25
 By including 'a comparison of earnings' in its list of 'additional factors' the Commission may have had reference to FPC v. Hope Natural Gas Co.,[54] were the Supreme Court said that
 
 
 26
 'the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.'[55]
 
 
 27
 As various commentators have noted,[56] implicit in this language are two methods for determining a fair rate of return. One, commonly referred to as the 'attraction of capital' standard, attempts to do so by looking to the capital costs of the enterprise as reflected in earningsprice ratios. The other, frequently denominated the 'comparable earnings' standard and suggested by the italicized portion of the language quoted, is based on a comparison of the return on equity of the subject company with the returns afforded by other companies. Thus, while we are unable to accept the Commission's reasons for rejecting the cost of capital evidence presented to it, we certainly do not intend to intimate any disagreement with the Commission's statement that 'a comparison of earnings' is an additional factor to be considered.[57] On the contrary, we strongly admonish that a comparison of the returns being afforded Transit's shareholders with those of other companies of corresponding risk is necessary to a responsible determination of the proper margin of return which Transit should be allowed.[58] Notwithstanding the Commission's allusion in this case to the comparable earnings standard,[59] it is clear that it made no meaningful evaluation of the level of returns being afforded Transit shareholders.
 
 
 28
 In remanding, we noted that, at the time Transit began operations, the company's heavy debt capitalization[60] 'made inevitable large returns on equity to the extent that the relatively heavy interest requirements were safely covered and the gamble on traffic levels after the resumption of operations was won.'[61] But we added that:
 
 
 29
 'The urgency of the problem of traffic uncertainty has, however, receded appreciably into the past. Although it continues to exist to some degree by reason of the seemingly inexhaustible enthusiasm of motorists and highway builders, on the one hand, and persistent speculation about rail rapid transit, on the other, we think the time has come for the Commission to make a careful review and analysis of the earnings experience of Transit from its inception, and of what that experience has meant to the equity owners, both by way of dividend payments and growth in book values through retained earnings. We do not see how current fare increases can properly be appraised apart from such a study, and the reflection of its results in the articulation of the Commission's decision as to the margin of revenues over expenses appropriate to today's needs, as distinct from the crisis conditions of nearly a decade ago.'[62]
 
 
 30
 The Commission responded to these comments by setting forth gross statistics on Transit's total and average-per-year retained earnings over a nine-year period, and the range of net operating income figures over that period. It observed that 'the rate of dividend growth has been zero since 1960,' noted 'little growth trend in the earnings per share,' and stated that 'the degree of stock price stability in the market place indicates to us that earnings in the past have not been excessive.'[63] The Commission's approach thus appears to have been to justify current earnings and dividends by reference to those of the past, in clear contrast to our mandate that the Commission articulate its 'decision as to the margin of revenues over expenses appropriate to today's needs as distinct from the crisis conditions of nearly a decade ago.'[64]
 
 
 31
 There is much information in the records of both the 1963 and 1965 rate proceedings relative to Transit's return on equity, as well as the returns being earned by companies with which Transit might be compared,[65] but the Commission made no findings based on any of this evidence. We respect the Commission's primary fact-finding responsibility, but we cannot ignore the substantial indications in the record that the Commission has permitted Transit to earn extraordinarily high returns on its investment. The protestants in the 1963 proceeding introduced evidence that Transit's average book equity for 1963[66] would be $4,206,990,[67] and its debt expense for that period $602,089.[68] On this basis the total return of $1,480,746 allowed by the Commission represents a return on equity of $878,657, or approximately 21%.[69] Transit introduced data showing the average earnings on common stock equity of 15 transit companies for 1959-61 to be 8.7%,[70] and the protestants showed average earnings on book equity of 12 transit companies for 1952-61 to be 7.5%.
 
 
 32
 Transit's evidence in the 1965 proceeding discloses the average return on book equity for 18 urban transit companies for the period 1960 to 1964 to have been approximately 4.5%, while Transit's average return on book equity for the same period was 23.3%. Protestants introduced exhibits revealing that, for the period 1959 to 1964, Transit's average return on book equity was 24.01% While the average for ten transit companies for that period was 9.45%.
 
 
 33
 One witness in the 1963 proceeding testified that Transit had experienced 'abnormally high earnings on the equity investment,' and calculated that over a six-year period Transit had accrued earnings in excess of 'fair annual earnings on book equity,' which he set at 14%, in the amount of $3,882,000. Another witness in the 1965 proceeding testified that
 
 
 34
 'when one looks at the figures (representing Transit's return on equity) * * * one wonders whether or not he is looking at the figures for a regulated utility. * * * There are many highly speculative industries which would like to be able to hold out such high returns to the equity investor.
 
 
 35
 I know of no other utility company that can show as high a return on equity, on average, as this one.'[71]
 
 
 36
 We do not decide, whether, based on this record, the Commission could have made a sustainable finding that the return allowed by Order No. 245 was 'commensurate with returns on investments in other enterprises having corresponding risks.'[72] In view of the Commission's failure to make a finding one way or the other on that question, no such inquiry on our part is called for.[73] We do think, however, that the Commission's failure to deal meaningfully with the evidence we have summarized is significant as a further indication that it has misconceived the nature of its responsibilities and the kind of inquiries and determinations that must be made in setting rates under the operating ratio method. In the absence of any inquiry into the appropriateness of the returns being afforded Transit shareholders in the light of returns being earned by other companies of comparable risk,[74] the peculiar risks borne by Transit shareholders,[75] and any other relevant factors, we are unable to conclude that the Commission has responsibly complied with its statutory mandate to prescribe just and reasonable fares.
 
 
 37
 In sum, we find in the Commission's supplemental opinion little in the way of 'particularized reference' to the matters discussed in our remand opinion, none of the essential findings called for, and no manifestation of inquiry into any of the considerations 'which must be prayerfully explored by the conscientious regulator before he can begin to say why he fixed upon 4.8 rather than 6.5 or 3.2.'[76] Instead, it has clearly treated Transit's $500,000 dividend payout as a 'cost of operation' without any inquiry into its appropriateness. It has dismissed evidence as to Transit's cost of capital as 'inappropriate.' And it has made no meaningful evaluation of the returns being afforded Transit shareholders. We think it evident that, though purporting to equate a fair return with 'the amount necessary to enable Transit to service its debt, pay reasonable dividends, retain a reasonable portion in its business, and to attract investments of private investors,'[77] the Commission has neglected to apply that principle in practice. Under these circumstances, the disposition we should make of the orders under review is a matter of some difficulty, to which we now turn our attention.
 
 Disposition
 
 38
 On our original review of this case in Transit I, we were unable to discern from the Commission's opinion the method by which it had computed the return to be allowed Transit. Because the Commission had 'described its deliberations and conclusions * * * (solely) in terms of stock generalizations which serve only to frustrate, rather than illuminate, judicial review,'[78] we were left without 'an adequate basis for knowing why it did what it did.'[79] But notwithstanding our uncertainty as to whether the Commission had actually made the inquiries and the concomitant decisions we held to be required by the statute,[80] we were unwilling to conclude, merely from the absence of findings in its order, that the Commission had not performed its duties.[81] Thus we did not disturb the effectiveness of the fare increase granted by Order No. 245, nor did we make provisions for restitution by Transit of increased fares collected pursuant to that order.[82] Instead, we remanded to the Commission to enable it to clarify the grounds of its action or, if necessary, to formulate a new order.[83]
 
 
 39
 The case now before us, however, is quite different. The Commission, once again, does not advance a rational basis for its determination of rate of return-- despite the opportunity afforded it to do so, after we had enunciated the applicable principles and emphasized the need for findings.[84] Moreover, it now appears affirmatively that at no time in this proceeding has the Commission made the investigations and the resolutions essential to a legitimate exercise of its authority to prescribe just and reasonable fares.[85] Since we cannot escape the conclusion that the Commission's approval of the fare increase was based upon a mistaken view of its responsibilities in setting rates under the operating ratio method, we hold that Orders Nos. 245 and 563 must be set aside.[86]
 
 
 40
 The question nonetheless remains whether we should again remand to the Commission, to permit further consideration and a new order. For even where agency action must be set aside as invalid, but the agency is still legally free to pursue a valid course of action, a reviewing court will ordinarily remand to enable the agency to enter a new order after remedying the defects that vitiated the original action.[87] A remand for this purpose, however, necessarily assumes continuing power in the agency to deal with the subject matter of the proceeding. Where, because of changed circumstances,[88] or because of the decisional grounds nullifying the initial order,[89] the agency does not possess that authority, a remand is manifestly unwarranted.
 
 
 41
 Orders Nos. 245 and 563 have been superseded by later fare orders entered by the Commission subsequent to our remand in Transit I.[90] The propriety of another remand thus hangs on the Commission's power to devise a new order, nunc pro tunc, governing the years intervening between Order No. 245 and the entry of a subsequent order prescribing the 'lawful fare * * * to be in effect.'[91] The Commission, however, possesses no authority to fix rates for the past. An order prescribing the lawful fares to be charged by a public utility, being essentially legislative in character, ordinarily speaks only for the future.[92] And we find nothing in the statutory provisions governing the Commission's regulatory responsibilities[93] that indicates an intent to depart from this 'customary pattern of fixing rates prospectively.'[94] Hence, we conclude that the Commission lacks power to enter a new rate order in this proceeding, and that a remand for further consideration is not called for.[95]
 
 
 42
 With Orders Nos. 245 and 563 invalid and further remand now futile,[96] it follows that Transit must be compelled to make appropriate restitution for the increased fares it collected.[97] This conclusion is unaffected by the fact that we do not decide that the fares authorized are unjust or unreasonable as a matter of law. Our role as a reviewing court is not to make an independent determination as to whether fares fixed by the Commission are just and reasonable, but rather to insure that the Commission, in exercising its rate-making power, has acted rationally and lawfully. Our function is normally exhausted when we have determined that the Commission has respected procedural requirements, has made findings based on substantial evidence, and has applied the correct legal standards to its substantive deliberations.[98] Our task is likewise at an end when we have ascertained that the Commission has not done so.[99] In this case, given our conclusion that the Commission failed to apply appropriate criteria, and failed to make the inquiries prerequisite to valid exercise of its rate-setting authority, we could not permit Transit to retain the increased fares, since to do so would be to give legal effect to the Commission's invalid order.[100] This is so notwithstanding that we have held neither that the Commission lacked power to order a fare increase, nor even that the fares authorized are, as a matter of law, unjust or unreasonable.[101]
 
 
 43
 Thus we are confronted with the necessity of formulating the criteria by which the amount of restitution is to be measured. Ordinarily, of course, the proper disposition on setting aside a rate increase unlawfully ordered by the Commission would be to compel the regulated company to restore the entire difference between the higher fares collected under the invalid order and the amount that it would have received from the fare schedule previously in effect.[102] More fundamentally, however, our decision in this regard is to be governed by the equitable considerations which apply to suits for restitution generally.[103] The basic question is whether 'the money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it,' and is 'no longer whether the law would put him in possession of the money if the transaction were a new one.'[104] Since restitution is not a matter of right, but is 'ex gratia, resting in the exercise of a sound discretion,'[105] it lies within our authority to direct restitution in an amount less than the whole sum of the increased fares collected under the invalid order,[106] or to deny it altogether, if compelling equitable considerations so dictate.[107] The exercise of such an equitable discretion by this court is by no means an usurpation of the administrative powers of the Commission nor is it an arbitrary extension of judicial authority; it is 'mere inaction and passivity in line with the historic attitude of courts of equity for centuries.'[108]
 
 
 44
 Because we have found the Commission's action in approving the fare increase to have been invalid, and because we have no basis in later valid action of the Commission for inferring that the rates set by Order No. 245 were in fact, just and reasonable, despite the defects in the Commission's deliberations leading to their original approval,[109] we could not, as we have said, give legal effect to those rates by withholding restitution altogether. At the same time, we are confronted by circumstances indicating a substantial probability that it would be inequitable to compel Transit to restore the entire amount it realized from the fare increase. More specifically, we see that by Order No. 245 the Commission found that the net income of $937,669 which Transit would earn under the then existing fare schedule would not constitute a 'fair and adequate return,'[110] and nowhere in this proceeding has that finding been challenged. Indeed, the evidence presented by protestants at the 1963 hearing was to the effect that a return of $1,107,000 would be fair and reasonable.[111] Additionally, we note that the net income which the Commission found Transit would earn in consequence of the preexisting fares would have represented a return on equity of less than 8%,[112] while protestants' expert witness recommended a return on equity of 12%.[113] And in a later rate proceeding, after determining Transit's cost of capital and taking into account the returns afforded by other companies of comparable risk, the Commission found to be fair and reasonable a return on equity of 14%,[114] a determination today affirmed by this court as based on adequate findings and reasons supported by substantial evidence.[115] We could not permit the Commission's latter conclusion to control the amount of restitution now to be ordered, since it was based on a record reflecting conditions in years later than the period relevant here,[116] and it did not purport to be a determination of a fair return for the years with which we are concerned.[117] On the other hand, it has obvious significance as a factor suggesting the inequity in ordering Transit to repay the entire amount of the fare increase.
 
 
 45
 In sum, we find substantial and unmistakable indications, in the record under review as well as in a subsequent determination of the Commission which we have affirmed, that it would be unfair to order Transit to restore the full amount it realized under the invalid fare increase. In so concluding, we have placed particular reliance upon the Commission's finding as to the amount of net income which would have been earned by Transit under the fare schedule in effect prior to Order No. 245. That finding was properly grounded, conformably with the Commission's role in fixing rates to operate in the future, upon estimates of expenses to be incurred and revenues to be received during the future test period. But we perceive no justification for permitting such a prediction to control the course we are to follow in equitably disposing of funds collected during years already past.[118] 'There are times, to be sure, when resort to prophecy becomes inevitable in default of methods more precise. At such times, 'an honest and intelligent forecast of probable future values made upon a view of all the relevant circumstances' is the only organon at hand. * * * But prophecy, however honest, is generally a poor substitute for experience.'[119] We think these observations are applicable here, and we are unable to see how any proper resolution of the matter of restitution in the circumstances presented could ignore the reality of Transit's financial experience during the years in question.[120]
 
 
 46
 In laying down a standard by which to measure Transit's right to retain funds collected under the fare increase, we are aware that we are ill-equipped, even were we authorized to do so, to search the record and reach our independent conclusions as to what would have constituted reasonable fares for the period in question. Nevertheless, the duty to reach a just decision in this regard cannot be shirked, and our effort must be to find a solution which lies within our competence as a reviewing court, while at the same time responding in the fullest possible measure to the equitable considerations that must guide us.
 
 
 47
 The disposition we deem most consonant with this objective would compel Transit to restore the amount realized by the fare increase only to the extent that its actual return is not reduced to an amount which all parties have agreed would be unreasonably low. Thus Transit will be permitted to retain any portion of the higher fares necessary to preserve its actual earnings during the years in question[121] at the level conceded by the protestants to represent a fair return. In so doing, we do not say that the Commission erred in failing to adopt the testimony of protestants' expert witness, nor that fares designed to produce the return proposed by the protestants would have been the only lawful fares, nor even that they would have been just and reasonable. We decide only that in the circumstances of this case it clearly does not offend 'equity and good conscience' to permit Transit to retain that part of the fare increase essential to avoidance of an undisputedly unfair return. One circumstance upon which we place considerable weight in reaching this conclusion is the availability of the Commission's 1967 decision permitting a return to the equity holder quite close to that recommended by the protestants in this proceeding.[122] Though, for reasons already explained, we are unable to regard that determination as controlling with respect to the question before us, we think it is entitled to weight as 'the opinion of a body of experts upon matters within the range of their special knowledge and experience.'[123] Being cognizant of the dangers in attributing finality to positions taken by the parties in a proceeding which so broadly affects the interests of the public as this one, we do not decide whether, in the absence of that later determination by the Commission, the course taken here would be open to us.
 
 II
 THE ACQUISITION ADJUSTMENT ACCOUNT
 
 48
 Petitioners in No. 20,201 complain of a fundamental change by the Commission in the method of its treatment of Transit's acquisition adjustment account, which has engaged our attention before.[124] The event giving rise to this account was Transit's purchase in 1956 of properties from its predecessor, Capital Transit Company (Capital), at a price lower by $10,339,041 than the net original cost of those properties to Capital.[125] Transit's allowances for depreciation thereon could, of course, have been related to its own acquisition cost; but this would have required the development of new depreciation rates computed on remaining life, and new depreciation bases derived in part from distribution of the purchase price among the items of property acquired. To save the labor incidental to that process, however, the Public Utilities Commission of the District of Columbia (PUC), the Commission's predecessor, ordered that two things be done. One was the establishment of the acquisition adjustment account to accommodate an amortization, over a ten-year period beginning August 15, 1956, of the $10,339,041 difference in acquisition cost to Capital and Transit, respectively.[126] The other was a direction that depreciation be accrued on the basis of Capital's original cost and at the rates previously fixed for Capital, with ten annual offsetting credits to operating expenses of $1,033,904 derived from the amortization.[127]
 
 
 49
 PUC selected the ten-year period for amortization in order to link it to an annual accrual of $1,044,196 over the identical period to a reserve designed to absorb Transit's estimated future expenses for track removal and street repaving incidental to its franchise-required conversion from Capital's trolley-bus operation to Transit's eventual all-bus operation.[128] With the amortization and the accrual in almost the same annual amount for exactly the same period, any material impact from either upon Transit's income posture would be avoided.[129]
 
 
 50
 In Order No. 245, however, the Commission suspended the annual accruals to the reserve as of January 1, 1963, concluding that its existing balance would cover all of Transit's removal and repaving expenses anticipated for the immediate future.[130] The Commission stated that it would also reexamine the period for liquidation of the acquisition adjustment balance in light of PUC's decision to coincide its amortization with the period established for accruals to the reserve for removal and repaving.[131] The Commission observed that 'the proper (original) solution (by PUC), completely equitable to both applicant and the ratepayers, would have required the total sum represented by the acquisition adjustment account to be distributed 'over all items of depreciable property' as recorded on the books as of August 15, 1956,'[132] and it felt that such treatment 'would have been the only completely accurate and equitable method.'[133] The Commission would, it said, 'relate the acquisition adjustment balance to the properties acquired on August 15, 1956, which are still in service and subject to depreciation at original cost'[134] but, noting that additional evidence was needed for this purpose, it ordered that amortization of the acquisition adjustment account continue without change 'until adequate evidence supporting a different rate (of amortization) is presented to the commission.'[135]
 
 
 51
 In Transit I, we upheld the Commission's determination on this point.[136] Shortly before we did so, however, the Commission, by Order No. 385, had proceeded to alter radically the scheme for amortization of the acquisition adjustment balance.[137] Without taking further evidence, it decided that as of January 1, 1964, the period for amortization of the balance of $2,519,484[138] would be extended to August 15, 1976, the duration of Transit's franchise.[139] The Commission thus enlarged the remaining original period, which would have expired on August 15, 1966, for the write-off of this balance from approximately two and one-half years to about twelve and one-half years, and reduced the amount of the annual amortization from the previous $1,033,904 to the much lower figure of $199,561.[140]
 
 
 52
 In directing this change, the Commission did not relate the liquidation of the acquisition adjustment balance to any new schedule for depreciation of the involved properties, a procedure it had promised in Order No. 245 and one which we had regarded as 'most sensible.'[141] Instead, it said that amortization of that balance within the remaining two and one-half years of the period originally prescribed might so reduce net operating profits after the terminal point on August 15, 1966 as to require another fare increase.[142] Thus arising is the question whether the Commission was at liberty to alter the mode of amortization, with a view to pegging Transit's fares, without correlating in some reasonable fashion, the new method in time and amount to ongoing depreciation of the acquired properties, for the inflated book values of which the acquisition adjustment account was established as an offset.
 
 
 53
 As a preliminary matter, though, we face, but reject, a common protest by Transit and the Commission that petitioners are foreclosed from litigating that issue because they did not seek a review of Order No. 385, by which the change complained of was directed. The Commission promulgated Order No. 385 without a hearing of any sort, in spite of its claim, in defending its earlier Order No. 245 before us in Transit I, that it had to have more evidence before it could intelligently alter the amortization of the acquisition adjustment balance.[143] And when the Commission adopted Order No. 385, it proceeded upon a completely new theory-- the need to stabilize Transit's fares. There was no opportunity for the protestants to combat the change, or the basis upon which it was made, before it became a reality.
 
 
 54
 Petitioners made a timely application to the Commission for reconsideration of Order No. 385. In denying it, the Commission proclaimed that the order was 'subject to complete analysis and review in any future rate proceeding.'[144] This very clearly left the matter open to reexamination, and indeed the Commission reexamined it in Order No. 564, this time rejecting petitioners' objection on the merits.[145] It is the determination made in the latter order, presently under review, that petitioners now attack, and this they may properly do.
 
 
 55
 Reverting to the merits of petitioners' contention, we find that the Commission's new plan for amortization of the acquisition adjustment balance largely sets for naught fundamental considerations the Commission was obliged to observe. One was the intended function of the amorization as the counterweight to excessive depreciation charges. While, on the assets Transit bought from Capital, Transit was annually taking the same depreciation Capital was allowed to take, the amount of the annual amortization was to balance out the difference between Transit's purchase price and their higher value on Capital's books.[146] Quite obviously, Transit's annual depreciation expense would become inflated if the compensatory value of the amortization was reduced. And such a reduction was necessarily destined when the Commission ordered its drastic changes in the amortization term and the amount of the annual amortization.
 
 
 56
 This we see in vivid outline as we again consult the record before us. Of $46,534,172 in original cost of the depreciable properties Transit acquired from Capital in 1956, a total of $35,979,793, or 77.3% Had been retired from service by January 1, 1964, the effective date of the Commission's change.[147] By Transit's projection, not significantly variant from the plan the Commission adopted in Order No. 385,[148] 61.1% Of the remaining $10,554,379 would be retired at the close of 1966, the future test period, and 89.3% Thereof at the end of 1970-- approximately the midpoint of the new amortization period.[149] At the same time, the acquisition adjustment amortizations, which would occur annually in level amounts, would quite expectably maintain a steady course. The evergrowing divergence of property retirements from acquisition adjustment amortization[150] is revealed in the following computation:[151]
 
 
 57
 The Commission's stated reason for modification of the acquisition adjustment amortization was the avoidance of a fare increase in 1966, when under the existing arrangement the amortization would come to an end.[152] Nonetheless, it did not undertake to support, either by evidence or findings,[153] its theory that this circumstance would create a probable need for such an increase, and on the record its view in that regard seems conjectural. This is especially so since at the time of the changeover there existed a court- ordered reserve of more than $2,000,000 to serve precisely the Commission's professed purpose.[154] And we detect, as serious consequences of the Commission's modification of the acquisition adjustment amortization artificial reductions of Transit's net earnings for ensuing years which ostensibly would justify the very fare increase that the change was predicted to forestall.
 
 
 58
 For the calendar year 1964, Transit stated a return on equity of 10.56%, reflecting $511,115 in net income and $4,837,992 in equity. Without the change, Transit's net income would have been $760,232 greater,[155] and the return on equity would have soared to more than 26%. Similarly, for the 12 months ending June 30, 1965-- the historical test period[156] -- Transit reported net operating income of $1,024,855, representing a 3.23% Rate of return; but without the change the return on equity, with another $760,232 in additional income for that year,[157] the rate of return would have been almost 75% Greater. Again, for 1966-- the future test period[158] -- Transit's net earnings were estimated at only $648,357,[159] but with the change its projected depreciation expense was $475,145 higher than otherwise it would have been.[160]
 
 
 59
 Judicial decisions have long censured depreciation plans breeding excessive charges which in turn exaggerate the costs of serving the public.[161] We ourselves have held, in a conceptually indistinguishable situation, 'that the substantial inflation of operating costs due to excessive depreciation * * * is unlawful.'[162] The Commission's handling of Transit's acquisition adjustment account does violence to the wholesome principle those cases espouse.
 
 
 60
 Moreover, the costs of the service a regulated utility provides should, as far as possible, be borne by those who are served as they are being served. The disproportion between the amortization of the acquisition adjustment balance and remaining depreciable life of the acquired properties charges present riders with substantial depreciation expense properly assignable only to those who will ride in the future. If Transit's customers are to pay for the rides they themselves take, operating expenses must be projected within a range that is reasonable in the historical as well as the mathematical sense.
 
 
 61
 We do not suggest that Transit should be required to make up at one fell swoop the differences reflected by possible percentage variations between the amount of depreciation accruing on the acquired properties before January 1, 1964, the Commission's changeover date, and the portion of the acquisition adjustment balance written off before that date.[163] Prior to that time, the period for amortization of that balance was related, not firmly to depreciable life of the properties Transit got from Capital, but rather, as we have said,[164] to the ten-year period for accruals to the reserve for track removal and street repaving; and this arrangement has never been challenged. The resolution of any problem in that connection is in the first instance, of course, a matter for the Commission. Now, however, the track removal and repaving accruals have been halted, at least temporarily, and the Commission has decided that it will put the amortization of the remaining acquisition adjustment balance on a different footing. We hold that, in doing so, it must maintain, subsequent to the change-over date, a reasonable relationship between the amortization and accruals of depreciation of the properties remaining in service.
 
 III
 DEFICIENCY IN DEPRECIATION RESERVE
 
 62
 In 1964, the Commission found a large deficiency, existing as of August 15, 1963, in Transit's reserve for depreciation on operating properties.[165] It then required the depreciation reserve to be adjusted upward to its proper level and as an offset, the amount of the deficiency to be placed in a suspense account.[166] In Order No. 564, the Commission decided to close out the deficiency balance of $1,099,627 in the latter account.[167] The blueprint it followed in doing so, however, gave rise to the cluster of problems we reach next.
 
 
 63
 Of the deficiency balance, $806,168 was the aggregate of underaccruals of depreciation on properties then still in service. The Commission directed that this amount be taken out of the suspense account and placed above the line[168] in Transit's depreciation expense account for 1966[169] and treating that much of the deficiency as a decrement Transit might legitimately recover from its farepayers, the Commission granted Transit 'restoration' by authorizing the removal of $806,168 from the court-ordered reserve[170] that we have mentioned[171] and will shortly consider in greater detail.[172]
 
 
 64
 The remaining $293,459 of the deficiency balance represented underaccruals on properties which, after the deficiency was ascertained, were transferred to nonoperating status. Holding that Transit could not collect that portion of the deficiency from its farepayers, the Commission decreed that it be transferred from the suspense account to the depreciation expense account as a below-the-line[173] entry.[174]
 
 The $806,168 Deficiency
 
 65
 Petitioners in No. 20,201 argue that the $806,168 should not have been charged off in a single year, and should not have been deducted from the court-ordered reserve. They point to the fact that some of the properties as to which this part of the deficiency arose have service lives exceeding 30 years, and urge that any recoupment be effected through annual deductions from operating income over the remaining life of Transit's franchise.
 
 
 66
 The problem, as we analyze it, breaks down into three facets, each of which we will discuss. The first concerns the handling of this item in the projection of Transit's operating costs preliminarily to establishment of a margin of return. The second is the question whether Transit may reclaim this portion of the under-accrued depreciation for its investors. If so, the third is whether its deduction from the court-ordered reserve, in lieu of some other type of adjustment, is in order.
 
 Treatment for Ratemaking Purposes
 
 67
 The Commission viewed the $806,168 as a loss to Transit's investors for which they had not been compensated, and felt that 'the techniques of preferring to accomplish (reimbursement) by a charge against a court-ordered reserve in lieu of charging a particular period's profit and loss account, is merely a matter of semantics.'[175] By its appraisal, 'whether the deficiency * * * is written off directly on the operating statement of a particular period or periods, or whether it flows first through the court-ordered reserve, the impact on the rate-paying public is still the same.'[176]
 
 
 68
 We are not able to concur in the Commission's reasoning. As we interpret the record, the above-the-line debit of the $806,168 to Transit's depreciation expense account added just that much in pre-1966 depreciation expense to Transit's operating costs for 1966. The calendar year 1966, it will be recalled, was the future annual period for which Transit's operating expenses were estimated,[177] and we understand that the Commission's estimates incorporated this adjustment.[178] If this is so, the projection of depreciation expense was inflated to the extent of $806,168 by a past, nonrecurring item. This, in turn, would necessarily misshape the margin of return that Transit was ultimately allowed.
 
 
 69
 We have, in another context, delineated the principle that, to avoid this very kind of distortion, deductions for depreciation must be maintained in reasonable relationship with the service period of the property depreciated.[179] To reach the closest possible accord with that principle, depreciation deficiencies, once ascertained, must ordinarily be amortized over such remaining life as the properties involved may happen to have.[180] We speak now of the treatment of the $806,168 for ratemaking purposes, and not of its possible defrayal by Transit's riders. In the understanding that the Commission included that part of the depreciation deficiency in its computation of Transit's expenses for the future test period, we say that its action in doing so was erroneous.
 
 Recovery from Farepayers
 
 70
 Petitioners do not contend that a depreciation deficiency cannot normally be levied against ratepayers, but encompassed, we thing, within their objection to deduction of the $806,168 from the court-ordered reserve is the query whether Transit's farepayers now have such an obligation.[181] It was 'clear to the Commission that this deficiency in depreciation charges should equitably be made up by charges to the ratepayer,'[182] but to us that is not nearly so evident. We would agree that if Transit's investors have not recouped the portion of their investment reflected by the deficiency, the Commission, weighing the equities, might in some reasonable manner impose some or all of the burden upon the riders.[183] We encounter difficulty, however, because although the Commission undertook to determine whether the burden should 'equitably' fall upon investors or farepayers, it nowhere appears to have ascertained whether Transit's investors have already been reimbursed for the diminished value of their investment.
 
 
 71
 We faced a cognate problem in Washington Gas Light Company v. Baker,[184] where PUC, in fixing the utility's rate base, deducted an allocable portion of its book reserve for depreciation rather than straight-line depreciation accruals. PUC acted upon the conclusion that the utility's revenues had been reduced because the annual charges for depreciation during most of the life of the property were too low, and that 'it would be inequitable for investors to bear the burden a second time by, for example, charging the undepreciated amount to earned surplus.'[185] We pointed out that
 
 
 72
 'Despite this premise, the record contains no evidence as to whether earnings during the life of this property sufficiently exceeded the fair rate of return to compensate investors for the inadequate depreciation charges. We recognize that the legality of past rates may not be challenged, and that past excessive earnings belong to the Company just as past losses must be borne by it. That is not to say, however, that when the Commission purports to act on the equities of the situation, and awards higher rates because of past inequities to investors, it must not support the factual premise upon which it builds by evidence in the record. 'Elaborate calculations which are at war with realities are of no avail."[186]
 
 
 73
 The same considerations are involved here. The Commission made no finding as to whether Transit's investors have received remuneration for the depreciation undercharges from actual earnings over and above fair return while the properties were in service.[187] Nor has our attention been directed to any evidence upon which a considered judgment in that regard could be attained.[188] We cannot approve as equitable an arrangement based upon a determination that does not reflect a consideration of factors crucial to an informed decision as to where the equities really lie. Our remand of Order No. 564 will provide an opportunity for the Commission to explore the matter, make findings, and reach a just conclusion responsive to the guidelines we have discussed.[189]
 
 Resort To The Court-Ordered Reserve
 
 74
 Should the Commission find that Transit's investors remain unreimbursed for the underaccrued depreciation, it would again face the question whether repayment could be accomplished by resort to the court-ordered reserve-- a course petitioners vigorously oppose. We reiterate, however, that the $806,168 represented depreciation accruing during an era gone by, and that to no extent was it an advance charge for depreciation to arise only in the future. And we rule that the court-ordered reserve is a legitimate source for full and immediate rectification of any unreimbursed deficiency that might be found.
 
 
 75
 In our 1963 Bebchick decision,[190] we held that a fare increase PUC had granted Transit was unwarranted, and this made necessary a disposition of the excess in fares that Transit had collected while the increase was in effect. It was 'not feasible,' we said, 'to require refunds to be made to individuals who paid the increase,'[191] but 'nevertheless, the amount realized by Transit from the increase must be utilized for the benefit of the class who paid it, that is, those who use Transit.'[192] To accomplish this, we continued Transit must establish a fund, or set up an account or reserve, in an amount equal to the increase.[193] We specified that 'the utilization and disposition of the fund, or the special account or reserve, as the case may be, shall be left to the discretion of the Commission having regulatory authority with respect to Transit, provided such discretion is exercised consistently with the purpose of benefiting Transit users in any rate proceedings pending or hereafter instituted.'[194] Thus the special reserve, to which the Commission within these limitations was at liberty to resort, soon thereafter came into being.[195]
 
 
 76
 The deficiency in Transit's depreciation reserve developed because too little depreciation had been charged to farepayers in 1963 and prior years.[196] The Commission, in correcting the deficiency of $806,168 from the court-ordered reserve, endeavored to place the charge, as nearly as could be, where it should always have been. As the Commission said, 'the logic of charging this deficiency off against the court-ordered reserve lies in the fact that just as the credits in the court-ordered reserve represent a build-up over a period of years prior to the current year, so does the depreciation reserve deficiency represent a build-up in past years' depreciation charges to be made up in current or future periods.'[197]
 
 
 77
 In sum, the court-ordered reserve is the equivalent of fare overpayments, and the deficiency is the amount of depreciation undercharges, both occurring in the past. The Commission's conclusion, in essence, was that the past depreciation undercharges might be offset by the past fare overcharges.[198] The objectives the reserve was designed to achieve, we think, are well served by its use to make Transit whole for any unredeemed diminution in value of its properties devoted to past public use, in lieu of the imposition of that burden on future farepayers. We would regard such a procedure as a proper exercise of the Commission's regulatory discretion,[199] provided only that Transit's investors have not already received adequate recompense.
 
 The $252,688 Deficiency
 
 78
 As we have observed,[200] the Commission directed that $293,459 of the total depreciation deficiency be charged below the line to Transit's depreciation account for nonoperating properties, thereby foreclosing its recapture from the farepayers. Transit concedes that this was proper as to $40,771, which relates to properties never placed in public use,[201] but contests the disposition of the remaining $252,688, asserting that the latter was a recoverable depreciation deficiency on operating properties.
 
 
 79
 The $252,688 is unreimbursed depreciation accumulating on a garage and on an office building while in public service during the period in which the general depreciation underaccrual occurred. After the deficiency was discovered by the Commission in 1964 and its amount was ascertained, the garage in its entirety and the office building to the extent of 80% Were transferred to nonoperating status and removed from public use.
 
 
 80
 The sole reason the Commission advanced for the adjudication complained of was that because these properties were no longer in public service at the time the Commission decided to close out the depreciation suspense account, they should assume their aliquot share of the deficiency.[202] This conclusion, we hold, is erroneous as a matter of law. Indisputably, $252,688 of the deficiency was attributable to the garage and the office building at a time when they were fully operative and wholly devoted to public service. Like unrecovered depreciation accruing on other properties while so engaged,[203] Transit was entitled to reimbursement of the $252,688 from its farepayers. There is no disabling connection between a deficiency in past years' depreciation and the fact that the property giving rise to it is subsequently withdrawn from public use. The charge for depreciation is generated while the property is consigned to the public weal, and is not eroded by what is done with it thereafter.
 
 
 81
 The Commission must therefore give the deficiency of $252,688 the same treatment that the $806,168 will be accorded. This means that the Commission, after thorough investigation, will first determine the extent, if any, to which Transit's investors may have already been repaid by excesses of past actual earnings over a fair margin of return while the properties in question were in service.[204] The Commission will then proceed to a disposition consonant with justice to all concerned.
 
 IV
 THE INVESTMENT TAX CREDIT
 
 82
 Transit has benefited considerably from the investment credit, since 1962 permitted against federal income taxes,[205] including a credit estimated at $685,608 for the test year 1966.[206] The Commission did not, either for that year or for any prior period, utilize the credit to reduce its ratemaking projections of Transit's total tax expense. Petitioners in No. 20,201 complain that, as a result, these savings have never been passed on to Transit's riders, and that this in effect has required the riders to pay for taxes greater than those Transit has actually incurred. Transit should be required, these petitioners urge, to transmit the credit to its customers through the medium of lower fares.
 
 
 83
 Order No. 564 tells us that the Commission's treatment of Transit's investment credits is an effort 'to comply with the intent of Congress as expressed in Section 203(e) of the 1964 (Internal) Revenue Act.'[207] That section restates the congressional purpose, in making the credit available, 'to provide an incentive for modernization and growth of private industry (including that portion thereof which is regulated).'[208] It further provides, germanely to the issue here, that 'Congress does not intend that any agency or instrumentality of the United States having jurisdiction with respect to a taxpayer shall, without the consent of the taxpayer, use' the credit 'to reduce such taxpayer's Federal income taxes for the purpose of establishing the cost of service of the taxpayer or to accomplish a similar result by any other method.'[209] We have already had occasion to analyze the requirement Section 203(e) imposes, and to apply it with full force to a federal regulatory agency.[210]
 
 
 84
 The Commission's discussion of the problem leaves us uncertain as to whether it considers itself controlled by Section 203(e), or as to whether the Commission adheres to it as a matter of administrative policy. The section in terms applies only to an 'agency or instrumentality of the United States,'[211] which the Commission clearly is not. It is the creature of the Compact[212] made by the District of Columbia and the states of Virginia and Maryland, to which Congress of constitutional necessity consented,[213] consolidating the Washington metropolitan area for unitary regulation of mass transit service. Congress contemplated that the Commission would be 'the common agency of the signatories,'[214] and the Compact designates the Commission 'an instrumentality of' the three contracting powers,[215] a character inevitable from numerous provisions it contains.[216] The Commission was in error if it felt that it was inexorably bound by the injunction Section 203(e) imposes.[217]
 
 
 85
 But the issue does not vanish here, for the Commission's authority to administratively adopt the canon expressed in Section 203(e) is something else again. 'A regulatory agency,' we have said, 'may, should, and in some instances must, give consideration to objectives expressed by Congress in other legislation, assuming they can be related to the objectives of the statute administered by the agency.'[218] It may, in an appropriate exercise of the authority delegated to it, select adjudicative guidelines from policy incorporated into statutes not legally binding upon it.[219]
 
 
 86
 It does not, however, appear that the Commission, in adhering to Section 203(e), engaged in a decisional act. Administrative discretion implies concentration upon a problem in its distinctive context, while legislation must necessarily address the problem more broadly. What in overall result may be wholesome as a legislative rule having general operation may be unfeasible as a judgmental exercise in a particular case. The Commission's consideration of Transit's investment credits embraced only a reference to the statute, with which it coupled 'an effort to comply with the intent of Congress as expressed in' the statute,[220] without any indication that it was making either a conscious choice or an individualized application of the statutory rule as a rule of its own. Moreover, it seems to have made no appraisal as to the desirability of applying the Section 203(e) requirement in the situation before it, or effort to balance an inducement to Transit to invest against the possibility of lower rates to the traveling public.
 
 
 87
 In sum, there are no signs of the particularized inquiries or the reasoned conclusions which make for an exercise of discretion. On the contrary, the Commission states that its disposition of the matter 'is in accordance with commission action in rate cases which were processed through this commission since the 1964 (Internal) Revenue Act was passed,'[221] and that 'the commission finds no reason at this juncture to change its policy with respect to treatment of the investment tax credit.'[222] This plainly connotes an undeviating course pursued with reference to every carrier in every Commission proceeding, irrespective of its individual and perhaps unique characteristics.
 
 
 88
 This case is essentially not unlike FCC v. RCA Communications, Inc.,[223] where the commission involved, because of the 'national policy in favor of competition,'[224] authorized an applicant to furnish radiotelegraph service to two foreign countries in duplication of a similar service already afforded by another company. The Court pointed out that 'the Commission has not in this case clearly indicated even that its own experience, entirely apart from the tangible demonstration of benefit for which (the other company) contends, leads it to conclude that competition is here desirable. It seems to have relied almost entirely on its interpretation of national policy.'[225] The Court said that 'had the Commission clearly indicated that it relied on its own evaluation of the needs of the industry rather than on what it deemed a national policy, its order would have a different foundation'[226] but, it added, 'to say that national policy without more suffices for authorization of a competing carrier wherever competition is reasonably feasible would authorize the Commission to abdicate what would seem to us one of the primary duties imposed on it by Congress.'[227] In the Court's view, it was 'not inadmissible for the Commission, when it makes manifest that in so doing it is conscientiously exercising the discretion given it by Congress, to reach a conclusion whereby authorizations would be granted wherever competition is reasonably feasible.'[228] But the Commission's grant, it was held, was infirm because 'the conclusion was not based on the Commission's own judgment but rather on the unjustified assumption that it was Congress' judgment that such authorizations are desirable.'[229]
 
 
 89
 We think substantially similar considerations obtain in this case, and conclude that we should remand to the Commission for inquiry and deliberation suitable to proper treatment of Transit's investment credits. Legislative policy reflected in tax statutes of general application may have a legitimate role in rate regulation, and tax objectives may be honored in a degree appropriate within the principles mandated by the specific regulatory statute drawn into the litigation.[230] This is particularly so when, as here, it is evident that without regulatory consequences the tax program may encounter frustration.[231]
 
 
 90
 The congressional goal in making the investment credit available is crystal clear. The committee reports on the 1962 legislation-- which gave birth to this credit-- stated in unison that the aim was to stimulate investment by reducing the net cost of acquiring depreciable assets.[232] 'Realistic depreciation alone, however,' the Senate Committee on Finance explained, 'is not enough to provide the essential economic growth. In addition, a specific incentive must be provided if a higher rate of growth is to be achieved.'[233] And while, save as a reflector of legislative policy, Section 203(e) does not itself concern the Commission, the fact remains that Transit, in common with other taxpayers, was made a beneficiary of the investment credit by the 1962 provisions. Neither in purpose nor in substance were the latter affected in their bearing upon nonfederally regulated utilities by the circumstance that the Section 203(e) compulsions were limited to federal regulatory agencies.
 
 
 91
 On the other side of the ledger is the admonition that 'when the out-of-pocket tax cost of the regulated (taxpayer) is reduced, there is an immediate confrontation with the ratemaking principle that limits costs of service to expenses actually incurred.'[234] Deviations from that guideline can be tolerated only when solidly justified upon 'a delicate balancing by the Commission of the interests of the company, its shareholders, the consumer and the public.'[235] In our view, congressional objectives underlying both the tax and the regulatory laws here involved would be subserved by Transit's retention of so much, but no more, of its investment credits as would provide sufficient incentive for outlays in depreciable properties on a scale and at a pace beneficial to the traveling public.[236] This will, of course, involve a careful assessment of the extent, if any, to which Transit, as a regulated carrier, needs the inspiration the investment credit is designed to furnish and, if so, the treatment essential to meeting that need.[237] The precise point at which relevant tax policy and ratemaking principles may become reconciled is primarily a matter of administrative expertise and judgment, subject to judicial appraisal by the standards traditionally governing review of administrative action.[238] But any play the Commission might give to Section 203(e) requirements can be indulged solely in consequence of an exercise of its own judgment,[239] soundly conceived and exercised with appropriate regard for the responsibilities entrusted to it, and our approval will be summoned only by a rational accommodation of the investment credit within the Commission's positive duty to maintain the reasonableness of Transit's fares.
 
 V
 
 92
 DEFERRED TAX CHARGES ON TRACK REMOVAL AND STREET REPAVING COSTS
 
 
 93
 From August, 1956, through the calendar year 1962, as we have mentioned in another context,[240] Transit accrued $1,044,196 annually to its reserve for track removal and street repaving, but during the same period spent substantially less for these purposes.[241] In the computation of its District of Columbia income taxes,[242] Transit was allowed deductions, not for amounts accrued, but only for removal and repaving costs actually incurred during the tax year.[243] The ratemaking treatment warranted in this situation thus became a problem confronting Transit's regulatory agencies.
 
 
 94
 In 1959, PUC ordered the resulting increases in Transit's income taxes to be charged to the reserve for removal and repaving, attributing this technique to a net-of-taxes theory.[244] The underlying idea was that there would be charges to the reserve, instead of to income tax expense, for the higher taxes in the earlier years when accruals exceeded expenses; and that these charges would be offset, in the later years when taxes would decrease as actual expenses surpassed accruals, with credits to the reserve matched and corresponding debits to income tax expenses. Thus, said PUC, 'the customers will not be currently charged with the total estimated cost of track removal and repaving without the offsetting benefit of the related reduction in income taxes.'[245] By mid-1965, in consequence of this process, the reserve had been reduced by $222,072 in accumulated tax charges.[246]
 
 
 95
 In the meanwhile, after the Commission suspended accruals to the reserve in 1963,[247] Transit's track removal and street repaving expenses became substantial. By Order No. 564, the Commission directed Transit to remove the $222,072 from the reserve by a credit in that amount to the reserve and a contra-debit to a new account denominated 'Deferred Tax Charges-- Track Removal Costs.'[248] The Commission stated that this adjustment 'was made to conform with the 'net of taxes' treatment instituted by' PUC,[249] explaining that 'if the charges to the (reserve) account were generated on a 'net of taxes' basis, and continued thus over a 7-year period as long as debt adjustments were required, consistency demands that, now that the time has arrived for the credit entries, the procedure set up by the PUC be continued to its logical conclusion.'[250] The Commission then made provision for a new charge, as an operating expense for 1963 and the first eight months of 1964, of 5% Of Transit's net cost of track removal and repaving.[251] The Commission also made known its plan to 'continue the entire 'net of taxes' treatment of track removal expenditures until the entire amount of $222,072.22 is offset.'[252]
 
 
 96
 Transit's prime objection to this procedure stems from apprehensions that it will reduce its recovery of the increased income taxes it was required to pay to the District. After the Commission stopped accruals to the reserve for track removal and repaving, Transit's annual expenditures for track removal and repaving rose to a point higher than its annual District taxable income.[253] Since the District makes no provision for carrying tax losses forward, Transit urges that it will be permanently deprived of at least some of the tax decreases in later years that, on a net-of-taxes basis, would ordinarily have approximated the earlier tax elevations. Transit also argues that by directing the 5% Charge as an annual operating expense, the Commission has departed from the net-of-taxes approach in seeking to make Transit whole.
 
 
 97
 We find Transit's fears to be unfounded, and its criticisms of the Commission's program unavailing. The Commission fully recognized that the increased income taxes Transit has been required to pay to the District, as well as all its expenses for track removal and street repaving,[254] are ultimately to be charged to its fare-payers. The Commission's order, as elucidated by an elaborate interpretive representation,[255] in practical effect simply defers the charges for taxes to such times as expenditures are made from the reserve. The burden of the charges will eventually fall upon the farepayers, and Transit's reimbursement therefor will sooner or later become complete. We need not ponder whether, consistently with law and with sound ratemaking and accounting principles, the Commission might have dealt with the problem differently.[256] Nor need we join in the debate between Transit and the Commission as to whether its treatment accords with the original net-of-taxes theory, to which the Commission in any event was not legally wedded.[257] It was clearly within the Commission's authority and discretion to relate Transit's recovery of the tax increases to its actual expenditures from the reserve,[258] and we decline to upset on grounds of unreasonableness the method by which it does so.
 
 VI
 ESTIMATE OF BUS MAINTENANCE
 
 98
 Transit projected the expenses[259] associated with the operation of its buses by adding to its actual operational costs of $4,249,452 during the historical test period ending June 30, 1965, the increases, computed on a system-wide basis,[260] which it anticipated for 1966, the future test period. The Commission, however, adopted the estimate of its staff, which was lower by $426,538.[261] This difference was attributable to a decrease in expenses which the staff expected as a result of Transit's programmed replacement of 100 old buses with new buses in June, 1965, and a turnover of another 100 buses in June, 1966.
 
 
 99
 The Commission's staff accepted, as the cornerstone of its projection, Transit's historical cost figure of $4,249,452. It began its calculation of adjustments for the future by estimating the number of miles buses in each of various groups[262] would travel during 1966, and multiplying those miles by a per-mile cost of operation for that group. It then worked into its computation the 200 new buses, assigning to each a maintenance cost factor, throughout 1966, of six cents per mile of operation, exclusive of increased labor costs for 1966; and eliminated the 200 oldest buses in Transit's fleet, which were much more expensive to maintain.[263] This substitutional technique won the approval of the Commission, which deemed it 'the most important adjustment' that Transit should have made.[264]
 
 
 100
 This observation, to say the least, is not fully accurate. Transit's appraisal of future expenses, as we have pointed out,[265] incorporated bodily its expenditures for bus maintenance during the historical test year expiring in June 30, 1965. Since the beginning of 1962, when Transit became fully converted to an all-bus system, it has acquired an average of about 115 new buses each year, and has removed from service an equivalent number of its older buses; and from 1958 until 1962, it had similarly replaced 75 to 100 buses per year. Thus Transit's actual maintenance expense for the historical test year, which the Commission's staff accepted and utilized,[266] included and gave full credit to the savings realized from the exchange during that year of approximately the same number of new buses which would displace old buses during 1966, the future test year. From aught that appears, the staff's appraisal in some measure-- perhaps in large part-- duplicated this reduction,[267] and concomitantly lowered the amount purporting to reflect Transit's overall bus maintenance expense for the future.
 
 
 101
 But this is not all. The evidence vindicates Transit's thesis that operational expenses become larger as a bus grows older, and obviously a new bus placed in service in mid-1965 or mid-1966 will be months older at the end of 1966.[268] Since the staff's rating for the maintenance of the 200 new buses was an unchanging factor of six cents per mile throughout 1966, the increased cost of operation that accompanies aging was not given its just due.[269]
 
 
 102
 Moreover, the staff's estimate of six cents, the record reveals, was derived from Transit's operation of 20 brandnew buses over a period during 1965 of less than a month.[270] A cost history of the operation of so few new buses for so short a time affords a dubious statistical base for projecting the maintenance expense for as many as 200 buses in periods ranging from six to 18 months.[271] Moreover, the staff's six-cents factor was overwhelmingly contradicted by Transit's experience data fixing a significantly higher figure.[272]
 
 
 103
 Still another problem springs from the manner in which the Commission's staff, preliminary to application of its per-mile cost factor, undertook to ascertain the mileage which the new buses would travel in place of the old. Transit was unable to respond initially to the Commission's request for information as to how the new buses would be allotted to scheduled operations because those determinations had not at the time been made. The staff then proceeded to allocate mileages to the new vehicle according to its own views as to the various routes on which Transit could best use them. The record discloses, however, that in the process the staff overlooked requirements which precluded many of the assignments it made.[273] And Transit made a convincing demonstration that, with valid assignments, an application of even the staff's disputed cost-per-mile estimates would have resulted in 1966 maintenance expenses considerably greater than those predicted by the staff.[274]
 
 
 104
 The Commission itself concluded that 'the staff estimate appears low, due, at least, to bus-assignment difficulty'[275] but, because of alleged deficiencies in Transit's computation,[276] 'accept(ed) as reasonable the estimated maintenance costs projected by the staff.'[277] It was not, however, enough to validate the staff's 'low' opinion, which the Commission incongruously embraced 'as reasonable,' simply to refer to claimed shortcomings in Transit's evaluation, which the Commission rejected. Rather, it was incumbent upon the Commission, if dissatisfied with both, to require whatever more it deemed essential to the performance of its duty to forecast Transit's bus maintenance expense with all the precision reasonably obtainable.[278]
 
 
 105
 We must sustain the Commission's findings when they materialize as rational deductions grounded on substantial evidence in the record considered as a whole.[279] But here the miscalculations to which we have adverted robbed the staff's estimate of the degree of reliability that separates admissible opinion from ineligible conjecture. We hold that the Commission erred in accepting that estimate as the basis for its finding as to Transit's expenses of bus maintenance during the future annual period.
 
 VII
 1965 MARGIN OF RETURN
 
 106
 In Order No. 564, the Commission found 'that a margin of return above operating expenses in the amount of about $2 million is fair and reasonable for 1966,'[280] the future annual period. Estimating that under existing fares Transit's net earnings would be only $648,357, but that the court-ordered reserve could provide the difference, it denied a fare increase and ordered that approximately $1,350,000 be paid to Transit from the reserve.[281] Petitioners in No. 20,201 challenge the adequacy of the Commission's findings as to margin of return and the related transfer of funds. We hold that the Commission's findings do not justify the return the Commission allowed or support the withdrawal from the court-ordered reserve.
 
 
 107
 From the Commission's discussion we glean the formula by which it set the margin of return at $2,000,000. Additionally to Transit's estimated debt expense of $960,000, it allowed '$400,000 to $500,000' as an annual dividend[282] and '$550,000 to $650,000' as a 'cushion.'[283] The Commission's projection of Transit's debt service has not been challenged, and it has substantial support in the record,[284] so we have no difficulty with the treatment of that item. But we cannot accept the Commission's methodology as to the two remaining components of the margin of return it awarded.
 
 Dividend Payout
 
 108
 As we said in Transit I, a 'just and reasonable' rate is one that enables the utility, among other things, to 'pay dividends sufficient to continue to attract investors.'[285] But there we criticized the Commission's apparent treatment of an annual dividend payout of $500,000 as a 'cost of operation, * * * with no examination of, or conclusion about, its appropriateness.'[286] And elsewhere in this opinion we have noted that the mere fact that annual dividends in a particular amount have been paid in times gone by is in no sense a proper basis for permitting dividend payouts to continue at the same level in future years.[287]
 
 
 109
 As its sole reason for including in the margin of return '$400,000 to $500,000' for dividends, the Commission stated that 'Transit has paid an annual dividend of $500,000 since 1960 and the testimony tends to show that the market place assumed the continuation of such dividend.'[288] To the extent that the Commission's judgment as to a suitable dividend rests upon Transit's traditional dividend payout policy, it continues the approach we disapproved in Transit I[289] and which earlier in this opinion we held to be arbitrary.[290] However, the Commission's addition-- that 'the market place now assumes the continuation of such dividend'-- poses the question whether that statement is tantamount to a sustainable finding that dividends lower than those paid historically would not be sufficient 'to continue to attract investors.'
 
 
 110
 The assertion that the market place 'assumes' continuity in the amount of Transit's dividends could mean that absent the customary yield prudent investors would cease viewing Transit's stock[291] as a desirable investment, in comparison with other opportunities of similar risk, and thus that Transit would no longer be able to secure the equity capital it needs to assure its continued vitality.[292] If that were the case, the Commission would have ample justification for concluding that a return less than that required to maintain dividends at former levels would be unreasonably low. On the other hand, the observation that the market place 'assumes' the continuation of a $500,000 dividend payout, could be understood as signifying only that a lower dividend yield might affect, to some degree, the market price of Transit's stock. And to say that the market price of the stock might drop to a price somewhat lower than it was in prior years is not at all to say that the company's ability to attract the equity capital it needs would be jeopardized.[293]
 
 
 111
 A method for determining a fair return or a reasonable dividend yield which looks solely to a pegging of the market price of the company's stock at past levels is manifestly unacceptable.[294] Past returns may have been unreasonably high, resulting in an inflated market price for the stock; if so, the public interest would not permit, much less require, maintenance of the status quo.[295] And even if past returns were warranted in the light of then existing risks and uncertainties, changed conditions may demand a lower return for the future, even if that results in the market's revaluation of Transit's stock.[296] In short, the Commission's duty is to authorize a return which is sufficient, but not greater than necessary,[297] to preserve the financial integrity of the enterprise, and which is fair and reasonable in the light of current conditions, as distinct from those that may have existed in times past.[298]
 
 
 112
 In support of its statement that the market place 'assumes' continuation of past dividends, the Commission apparently relied on the testimony of Transit's expert witness that
 
 
 113
 'if the annual payout (of $500,000) was not continued, the adverse effect on the market value of the stock of the parent would be considerable, and the financial stability of Transit would deteriorate in the eyes of the financial community.'[299]
 
 
 114
 But this assertion, standing alone, does not provide adequate support for a finding that Transit's traditional annual dividend payout must persist in order to 'continue to attract investors'-- even assuming that such a finding was made.[300] For, as we have said, whether or not a lower dividend would reflect adversely on Transit in the eyes of the financial community and thus affect the market price of its stock, it does not follow inexorably that Transit would thereby be precluded from securing needed equity capital. Whether the latter consequence would flow from a lower dividend yield is something the Commission could not know without at least ascertaining Transit's financial requirements, assessing the current risks that attend its operation, and examining 'earnings on investments carrying comparable risks.'[301]
 
 
 115
 As in the 1963 proceeding, both Transit and the protestants presented evidence relating to Transit's earnings-price ratios, and those of other companies; Transit's return on equity, and the returns afforded by natural gas and electric utilities, as well as other urban transit companies; and dividend-price and dividend payout ratios for Transit and other utilities. The Commission's opinion virtually ignores this information.
 
 
 116
 The Commission did observe that the protestants' 'cost-of-capital method of determining a fair rate of return for Transit in this proceeding is not wholly applicable to the transit industry generally and to Transit in particular.'[302] What the Commission meant by this is not clear. We can only infer that it had in mind considerations similar to those which led it to reject as 'inappropriate' the cost of capital evidence adduced by the protestants in the 1963 proceeding, and we need not repeat our discussion of those reasons here.[303] It suffices to again point out that if a 'cost of capital approach' is to be dismissed as 'inappropriate' or spurned as 'not wholly applicable,' it is incumbent upon the Commission to say why and to set forth for the record, through analysis and findings, the alternative method it employed to determine fair return.
 
 
 117
 The Commission made no evaluation of Transit's annual dividend payout or its overall return in the light of dividends and returns of companies of comparable risk.[304] Indeed, the only concrete finding based upon any of the evidence to which we have referred was that the $2,000,000 margin of return it authorized would produce a return on rate base of 7.4% Which, it said, was 'low.'[305] In view of the Commission's failure to take into account the evidence we have summarized, and to weigh the considerations essential to a proper determination of a fair return, we cannot credit its finding as to a reasonable dividend yield, resting as it does solely upon past payouts and unsupported inferences as to the market behavior of Transit stock.
 
 
 118
 The 'cushion'
 
 
 119
 We also hold that the Commission has failed to justify its inclusion of '$550,000 to $650,000' as a 'cushion' in the margin of return it allowed. The 'cushion', the Commission stated, was the amount 'required to enable Transit to maintain a sufficient surplus to cover contingencies and to assure the financial stability of Transit.'[306] The Commission explained the need for the 'cushion' as follows:
 
 
 120
 'Admittedly, the commission has been conservative in its estimates for future revenues and expenses. In fact, the difference between the net operating income projections of the commission and Transit amounts to more than $800,000. The commission feels that in prescribing rates under the operating ratio method it should be careful not to overestimate revenues or expenses since the rate of return is directly geared to these items. If we, even inadvertently, should include margins of error, in the estimated operating revenues or expenses, we would be allowing a return on such errors. The great possibility of error in estimates and projections, a very real contingency, thus is better given weight here in the margin of return allowed than above the line where the effect would be compounded.'[307]
 
 
 121
 The process of fixing rates prospectively necessarily imposes on a rate-making authority the difficult task of estimating the utility's cost, in future years, of providing service to the public. Even the most intelligent estimate of future expenses, because it is an estimate, does not dispel completely the possibility of some inaccuracy.[308] Notwithstanding the uncertainty that attends all prophesy, a regulatory agency is duty bound to make its forecasts as accurate as it possibly can, and a reviewing court is entitled to assume that it has done so.[309] Nevertheless, without reference to any criteria whatsoever, the Commission here concluded that a 'cushion' of from $550,000 to $650,000 was needed to offset the supposed unreliability of its estimates.
 
 
 122
 The Commission stated that 'in prescribing rates under the operating ratio method it should be careful not to overestimate revenues or expenses since the rate of return is directly geared to these items. If we, even inadvertently, should include margins of error, in the estimated operating revenues or expenses, we would be allowing a return on such errors.'[310] But there is no indication in this case that any undue possibility of error existed. Indeed, the Commission's estimate of revenue differed from Transit's by only $173,000[311] on projected revenues of some $33,000,000. Moreover, Transit's calculations did not take into account significant revenue increases in the second half of 1965,[312] and the Commission projected a smaller increase in passenger volume than Transit had assumed.[313] Thus it would seem that the revenue estimates, if at all unreliable, tended to favor Transit.[314]
 
 
 123
 The Commission's concern over the possibilities of additional costs is equally undocumented. All of the contingencies it identified as potentially enlarging expenses appear to be remote or speculative, and merely variations on the theme that its estimates might be erroneous. For example, even though it made no provision for additional track removal expenditures, the Commission stated that 'the possibility exists that Transit might incur considerable expenses over and above the amount which remains in the track removal reserve in 1966. There is also the risk that the track removal program could be accelerated during the future period.'[315] Similarly, the Commission said that there 'is a possibility that the company will incur additional labor costs for the last two months of the year,'[316] without, however, undertaking to gauge the likelihood that its estimates of future labor expenses might be too low, or to quantify the additional cost of an erroneous projection.
 
 
 124
 Resort to a 'cushion' cannot relieve the Commission of its duty to explore, and make findings on the probabilities of future occurrence of particular expenses. And the line between those costs that can and those that cannot be projected for ratemaking purposes must at all times be scrupulously observed. Expenses too remote or speculative to be forecast with any reasonable degree of certainty, and those that are extraordinary and not likely to recur in normal periods,[317] should be disallowed. The Commission cannot 'cushion * * * (the) company in advance against unforeseen events' which do not constitute 'ordinary and necessary' expenses.[318]
 
 
 125
 The Commission, of course, was at liberty to allow a return which would enable not only the payment of an appropriate dividend, but also an addition to surplus of amounts necessary to insure financial stability and to provide to the equity holder a return which in the aggregate is fair and reasonable.[319] The error here is that, instead of making allowance for identified capital needs, and for an overall return 'commensurate with returns on investments in other enterprises having corresponding risks,'[320] the Commission viewed the 'cushion' simply as a means of offsetting possible errors in its expense predictions.[321] A fair rate of return, properly determined, already includes compensation for the risk that uncrystallized contingencies may later reduce actual earnings.[322] But without comparative data, any determination of added risk in isolation is completely arbitrary.[323]
 
 Disposition
 
 126
 In view of the fundamental inadequacy of the method by which the Commission determined the margin of return allowed Transit, we hold that its action in ordering $1,350,000 to be transferred from the court-ordered reserve was unlawful and must be set aside. Since Order No. 564, like Orders Nos. 245 and 563, has been superseded as a result of the Commission's subsequent approval of new fare schedules,[324] we will not remand the case for a new determination as to the margin of return.[325] However, as was our experience in connection with Orders Nos. 245 and 563,[326] we encounter substantial indications in the record that it would be inequitable to compel Transit to restore the entire amount it obtained from the reserve.[327]
 
 
 127
 In Order No. 564, the Commission found that the fares prescribed therein would produce net income of only $648,357 in the absence of any transfer of funds from the court-ordered reserve.[328] This amount was substantially less than the $1,550,000 proposed by the protestants[329] as a fair return.[330] Moreover, though the protestants recommended a return on equity of from 12% To 13%,[331] and though we have affirmed the Commission's 1967 decision permitting a return on equity of 14%,[332] the $648,000 would have been insufficient even to cover Transit's estimated debt expense of $960,000[333] for the future annual period.
 
 
 128
 Since it was uncontested that Transit was entitled to a return of at least $1,550,000,[334] and since that sum represents a return to the equity holder nearly identical to that approved by the Commission only one year later, we conclude that Transit should not be directed to make full restitution, if to do so would reduce its return below that level. Accordingly, Transit will be permitted to retain any portion of the funds transferred to it from the court-ordered reserve which is necessary to preserve its actual earnings during the period covered by Order No. 564 at the level conceded by the protestants to represent a fair return.[335]
 
 VIII
 SUMMARY
 
 129
 We here recapitulate, for the convenience of the parties and the Commission, the major dispositions required by the holdings delineated in this opinion.
 
 Orders Nos. 245 and 563
 
 130
 Orders Nos. 245 and 563 are set aside. Transit is directed to make restitution for all amounts collected as a consequence of the fare increase initially authorized by Order No. 245, during the period that order was effective, except that it may retain any portion of the excess fares necessary to preserve its earnings at the level conceded by the protestants to represent a fair return.[336] Restitution in the appropriate amount is to be effected by placing funds in or making non-cash credits to the court-ordered reserve.[337] The parties are requested to seek agreement as to the precise amount of restitution and the details for its accomplishment. Should the parties formulate a plan, they shall make application to the Commission for its approval, and in that event, or if no agreement is reached, the Commission shall supervise the execution of our mandate.[338]
 
 Order No. 564
 
 131
 The issue concerning the acquisition adjustment account is remanded to the Commission for a redetermination of the schedule for amortization of the balance thereof on the changeover date, and a relating of that schedule to the remaining lives of the properties in service on the changeover date. Any amounts heretofore charged against the account in excess of the amounts found to be proper shall be deposited in the court-ordered reserve.
 
 
 132
 The issue concerning the deficiency in the depreciation reserve is likewise remanded to the Commission for findings as to the extent, if any, to which Transit's investors have already been reimbursed for the diminution in value of their investment in operating properties devoted to public use over and above accruals to the reserve. The Commission may permit Transit to retain any portion of the total amount of underaccruals for which its investors have not been compensated in the form of past earnings in excess of fair returns. Any amounts permitted by Order No. 564 to be withdrawn from the court-ordered reserve for which Transit's investors have already been so compensated shall be restored to the reserve.
 
 
 133
 The Commission on remand is further directed to make findings and conclusions as to the treatment proper for Transit's investment tax credits, and the amounts, if any, by which Transit's federal income tax expense should be reduced as a consequence of any such credits. To the extent the Commission may find that Transit was permitted to accrue excessive income tax expenses for 1966, the amount thereof should be placed in the court-ordered reserve.
 
 
 134
 The Commission's authorization of a margin of return of approximately $2,000,000 is set aside, as is its action, in consequence thereof, permitting $1,350,000 to be transferred to Transit from the court-ordered reserve. The funds so transferred shall be restored to the reserve, except that Transit may retain any portion thereof necessary to preserve its net income at the level recommended by the protestants as a fair return.[339] As in the case of Orders Nos. 245 and 563, the parties are requested to seek agreement and apply to the Commission for its approval, and the Commission shall supervise the execution of our mandate.
 
 
 135
 Although we have also held that the Commission erred in its estimate of Transit's bus maintenance expenses for 1966, we make no separate provision to offset, by any amounts improperly disallowed, the sum which Transit is compelled to restore to the court-ordered reserve. For our disposition of the matter of restitution allows Transit a return computed on the basis of its actual experience during the period in question, and thus necessarily compensates it for all out-of-pocket expenses legitimately incurred.
 
 
 136
 So ordered.
 
 
 137
 DANAHER, Circuit Judge, concurs in the result in Nos. 20,200; 20,201; and 20,202; and in the opinion in No. 20,202 insofar as affirmance is directed.
 
 
 138
 J. SKELLY WRIGHT, Circuit Judge, (concurring in part and dissenting in part):
 
 
 139
 I concur in Judge Robinson's excellent opinion except for the following reservations with respect to Part IV relating to the handling by the Commission of the investment tax credit.
 
 
 140
 I agree with the majority's statement that the Commission 'was in error if it felt that it was inexorably bound' by Section 203(e) of the 1964 Internal Revenue Act to give the carrier, as distinguished from bus riders, the benefit of the investment tax credit since that section 'applies only to an 'agency or instrumentality of the United States,' which the Commission clearly is not.' However, the majority then states that 'the issue does not vanish here, for the Commission's authority to administratively adopt the canon expressed in Section 203(e) is something else again.' The majority quotes language from City of Chicago v. F.P.C., 128 U.S.App.D.C. 107, 113, 385 F.2d 629, 635 (1967), to the effect that '(a) regulatory agency may, should, and in some instances must, give consideration to objectives expressed by Congress in other legislation * * *,' and the remainder of Part IV implies that the giving of such consideration is appropriate here and that the Commission is to be faulted only because it blindly adopted the policy of Section 203(e) instead of exercising in a meaningful way the 'discretion' it possessed to do so or not.
 
 
 141
 My disagreement with this part of the opinion stems from my belief that, since Section 203(e) is not applicable, the Commission cannot give any consideration to the policy embodied therein. In other words, the Commission has no 'discretion' to deny the farepayers the benefits of the investment tax credit savings. I rely specifically on the language quoted by the majority from F.P.C. v. United Gas Pipe Line Co., 386 U.S. 237, 244, 87 S.Ct. 1003, 1008, 18 L.Ed.2d 18 (1967): 'When the out-of-pocket tax cost of the regulated (taxpayer) is reduced, there is an immediate confrontation with the ratemaking principle that limits cost of service to expenses actually incurred.' As this statement recognizes, basic to all ratemaking is fixing rates in terms of actual costs and that, of course, includes the actual cost of federal income taxes as well. To hold that the Commission has the discretion to fix the rates on the basis of total federal income tax liability without subtracting the amount of the tax credit which Transit is entitled to, and in fact takes, flies in the face of this principle.
 
 
 142
 I do not think that anything in our en banc decision in Panhandle Eastern Pipe Line Co. v. F.P.C., 115 U.S.App.D.C. 8, 316 F.2d 659 (1963), precludes our holding in this case that the Commission does not have the discretion to set a rate which is not based on a total flow-through. Certainly the spirit of Panhandle is that tax benefits should flow through and, although we there affirmed the Commission's discretion not to give the consumers the total benefit of the revenues generated by Panhandle's use of Section 167's authorization of accelerated depreciation, I think that part of the decision turned on the fact that accelerated depreciation is merely a tax deferral and not a tax saving like investment tax credit. We stated in Panhandle:
 
 
 143
 '* * * The liberalized method provides higher depreciation deductions and therefore lower taxes during the early part of the life of a given property, and lower deductions and higher taxes in the later years of the life of the property. The total depreciation deductions available to a company over the entire life of a facility are the same using either method. * * *'
 
 
 144
 115 U.S.App.D.C. at 10, 316 F.2d at 660. In this case giving Transit the benefit of Section 203(e) would result in a rate predicated in part on hypothetical costs not expended-- on taxes never to be paid. This, in my judgment, would be contrary to the fundamental principle of ratemaking.
 
 
 
 *
 Circuit Judge Fahy became Senior Circuit Judge April 13, 1967
 
 
 [1]
 121 U.S.App.D.C. 375, 350 F.2d 753 (en banc 1965)
 
 
 [2]
 In re D.C. Transit Sys., Inc. (Order No. 245), 48 P.U.R.3d 385 (1963)
 
 
 [3]
 Transit sought to raise to 25 cents the price of tokens then being sold for 20 cents in units of five for $1.00. Order No. 245 permitted Transit to increase the token fare to 21.25 cents, tokens to be sold in units of four for 85 cents. The order left unaffected the adult cash fare at 25 cents, as to which no change was requested
 
 
 [4]
 In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 411-413. The Commission utilizes the operating ratio theory in its ratemaking activities, see Transit I, supra note 1, 121 U.S.App.D.C. at 379 n. 3, 350 F.2d at 757 n. 3, and this margin translates to an operating ratio of 95.13
 
 
 [5]
 Transit I, supra note 1, 121 U.S.App.D.C. at 402, 350 F.2d at 780
 
 
 [6]
 Ibid
 
 
 [7]
 The calendar year 1966 was chosen as the future annual period for the projection of the operating results the new tariff was designed to achieve, and the 12-month period ending June 30, 1965, was employed as the historical test year. Neither selection is contested here
 
 
 [8]
 As previously, see note 3, supra, tokens would be sold in units of four. Thus the new tariff would increase the unit price from 85 cents to $1.00
 
 
 [9]
 Tit. II, art. XII, 6(a). The Compact is incorporated into Pub.L. 86-794, 74 Stat. 1031 (1960), and is set forth in full following D.C.Code 1-1410 (1967 ed.). Amendments to the Compact appear as a part of Pub.L. 87-767, 76 Stat. 765 (1962), and are set forth following D.C.Code 1-1410a (1967 ed.)
 
 
 [10]
 In re D.C. Transit Sys., Inc. (Order No. 563), 63 P.U.R.3d 32 (1966)
 
 
 [11]
 The Commission's supplemental findings in Order No. 563 purport to rest on the evidence developed in the 1963 hearing and on certain of the evidence adduced at the hearing in 1965
 
 
 [12]
 In re D.C. Transit Sys., Inc. (Order No. 564), 63 P.U.R.3d 45 (1966)
 
 
 [13]
 Id. at 68, 69. This represents an operating ratio of 93.97
 
 
 [14]
 Id. at 58, 68
 
 
 [15]
 115 U.S.App.D.C. 216, 232-233, 318 F.2d 187, 203-204 (en banc), cert. denied 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963). We discuss the origin and purpose of the reserve infra pt. III at notes 190 to 195
 
 
 [16]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 68-69. The Commission found that this arrangement and other accounting procedures it prescribed would, during the future annual period, provide Transit with net operating income of $2,009,122. Ibid
 
 
 [17]
 Compact, supra note 9, tit. II, art. XII, 16
 
 
 [18]
 Compact, supra note 9, tit. II, art. XII, 17(a); Pub.L. 86-794, 74 Stat. 1031, 6 (1960)
 
 
 [19]
 Petitioners in No. 20,200 are two riders who, in protest of the fare increase, participated in the proceeding leading to Order No. 245 and intervened on the former appeal. The United States, also an intervenor on that appeal, does not seek a further review. Petitioners in No. 20,201 are two additional riders (one of whom is counsel of record for petitioners in Nos. 20,200 and 20,201) and the Democratic Central Committee of the District of Columbia, who opposed the increase Transit sought in 1965. Transit is the intervenor in Nos. 20,200 and 20,201 and the petitioner in No. 20,202
 
 
 [20]
 In pt. I, we study Orders Nos. 245 and 563 in their relation to the margin of return allowed for 1963. In pts. II to VII, we deal with contentions as to an assortment of determinations set forth in Order No. 564. Pt. II probes a Commission-ordered extension of the period for amortization of the balance in Transit's acquisition adjustment account. Pt. III scrutinizes the Commission's handling of a deficiency in Transit's reserve for depreciation on its operating properties. Pt. IV examines the Commission's management, for rate-making purposes, of Transit's investment credits against federal income taxes. Pt. V inspects the Commission's treatment of Transit's additional District of Columbia income taxes resulting from a deferral of deductions on track removal and street repaving expenses. Pt. VI analyzes the Commission's estimate of Transit's costs for maintenance of its buses during the future annual period. Pt. VII considers the Commission's finding and rationale on the margin of return for 1966. In Pt. VIII, we recapitulate the procedures required for our disposition of the various issues tendered for decision
 
 
 [21]
 In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 44
 
 
 [22]
 Petitioners also found a claim of infringement of their statutory and constitutional rights upon the fact that Order No. 563 was formulated without any notice or hearing specifically related to that purpose. Our disposition, on other grounds, of that order renders unnecessary a consideration of that contention. Compare Bush v. State of Texas, 372 U.S. 586, 590, 83 S.Ct. 922, 9 L.Ed.2d 958 (1963); Barr v. Matteo, 355 U.S. 171, 78 S.Ct. 204, 2 L.Ed.2d 179 (1957); Rescue Army v. Municipal Court of City of Los Angeles, 331 U.S. 549, 568, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947)
 One additional question arising from our prior remand in Transit I-- the matter of overaccrued depreciation on Abandoned Rail Property-- is raised by petitioners in this proceeding. Petitioners seem to suggest that having found that there existed an overaccrual as of August 15, 1963, the Commission was barred by our opinion in Transit I from off-setting this by any under-accrual of depreciation of other properties during the period in question. It is enough to say with respect to this contention that there is no suggestion in our remand opinion that any such mechanical limitation on the Commission's discretion was intended. Consequently, we find no error in the Commission's treatment of this point on remand.
 
 
 [23]
 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [24]
 Ibid
 
 
 [25]
 Ibid
 
 
 [26]
 Transit is the wholly-owned subsidiary of D.C. Transit System, Inc., a Delaware corporation
 
 
 [27]
 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [28]
 In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 40-41
 
 
 [29]
 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [30]
 In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 41
 
 
 [31]
 In addition to the apparent unreliability of stock price stability as an indicator of the appropriateness of a given level of dividend payments, evidence in the record suggests that the market price of D.C. Transit (of Delaware) stock has not been nearly as stable as the Commission seems to feel. The average yearly market price-- the average of high and low prices in a year-- varied by as much as 14.6% During the years cited by the Commission. Moreover, the Commission has apparently not inquired into the significance of market price fluctuation within the years in question, and petitioners cite in their brief data showing substantial fluctuation within those years. For example, they state that the low for D.C. Transit (of Delaware) Class A public shares in 1960 was 8 1/2 while the high in 1961 was 14 3/8. And finally, the Commission, in utilizing figures as to the market price of D.C. Transit (of Delaware) stock in demonstrating the appropriateness of a given level of dividend payout by Transit, has failed to comment on the significance of evidence in the record that of the $500,000 dividend paid by Transit to its parent, see note 26, supra, only $400,000 has historically been passed on to D.C. Transit (of Delaware) stockholders. In a later rate order, the Commission commented on the unreliability of employing market price figures for Transit's parent in determining a proper return for Transit. Order No. 656 (unreported) (WMATC Jan. 12, 1967)
 
 
 [32]
 One witness did testify in the 1965 proceeding that 'the market place now assumes continuation of this $500,000 payout which has occurred every year since 1960. If this annual pay-out is not continued, the adverse effect on the market value of D.C. Transit System, Inc. (Delaware) stock would be considerable and the financial stability of D.C. Transit would deteriorate in the eyes of the financial community.' However, to the extent that this testimony relies on past dividends to justify the current dividend payout, it continues the approach we criticized in remanding, for it treats the $500,000 payout as a 'cost of operation,' without any consideration of its 'appropriateness.' Transit I, 121 U.S.App.D.C. at 401, 350 F.2d at 779. We are unable to see how the Commission could reach a judgment as to the 'appropriateness' of a particular dollar amount of dividends paid without inquiring into such things as the relationship between dividends and book equity per share, the relationship between dividends paid and market price per share, and a comparison of such figures with those for other companies of comparable risk
 
 
 [33]
 'The 'expertise' of a commission usefully serves it in evaluating the evidence, but that expertise can not supply evidence and can not, without findings made upon the critical issues before it, guide a commission to a rational and lawful decision.' Capital Transit Co. v. Public Utils. Comm'n, 93 U.S.App.D.C. 194, 205, 213 F.2d 176, 187, cert. denied 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 643 (1954)
 
 
 [34]
 Indeed, though the Commission should certainly take into account whether the return it allows will enable the company 'to * * * pay dividends sufficient to continue to attract investors,' Transit I, 121 U.S.App.D.C. at 400, 350 F.2d at 779, such consideration is more properly viewed as a means of checking the reasonableness of the overall return authorized rather than as an independent starting place for analysis. For, as the Commission has recognized in a later rate order, the payment of dividends is a matter primarily entrusted to managerial discretion and not subject to direct control by the Commission. Order No. 684 (unreported) (WMATC Mar. 13, 1967). Moreover, it would seem that in computing a capital-attracting rate of return there is little reason to distinguish between that portion of net income which is to be paid out in dividends and that portion which is to be retained in a capital account. See Bonbright, Principles of Public Utility Rates 250-51 (1961)
 
 
 [35]
 In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 41
 
 
 [36]
 Ibid
 
 
 [37]
 121 U.S.App.D.C. at 399 n. 56, 350 F.2d at 777 n. 56
 
 
 [38]
 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944)
 
 
 [39]
 121 U.S.App.D.C. at 400, 350 F.2d at 778
 
 
 [40]
 Ibid
 
 
 [41]
 The petitioners in No. 20,200 participated in the proceeding before the Commission as protestants. Other protestants and an intervenor in the Commission proceeding are not parties here
 
 
 [42]
 See In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 37
 
 
 [43]
 Ibid
 
 
 [44]
 See note 26, supra
 
 
 [45]
 See In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 39
 
 
 [46]
 See id. at 39-40. The witness' overall objective was to provide a return that would maintain the market price of a share of Transit stock at about its book value. Though at least one commentator has approved this approach, not all commentators have accepted its validity. Compare Note, An Earnings Price Approach to Fair Rate of Return in Regulated Industries, 20 Stan.L.Rev. 287 (1968) with Bonbright, supra note 34, at 254-256
 
 
 [47]
 The witness recommended that Transit be permitted to earn a total margin of return of $1,107,000 comprised of an allowance for estimated debt expense of $602,089 and a return to the equity holder of $504,838. See In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 39
 
 
 [48]
 In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 41-42
 
 
 [49]
 Having computed an estimated cost of debt, but see note 68, infra, and having arrived at a cost of equity capital, an overall cost of capital could be derived as follows: The estimated cost of debt is multiplied by a fraction representing the proportion which debt capital bears to the company's overall capitalization. The estimated cost of equity capital is multiplied by a fraction representing the proportion which equity capital bears to the company's overall capitalization. The two figures are then added to give the overall cost of capital. See Leventhal, Vitality of the Comparable Earnings Standard for Regulation of Utilities in a Growth Economy, 74 Yale L.J. 989, 992-993 (1965); Note, An Earnings-Price Approach to Fair Rate of Return in Regulated Industries, 20 Stan.L.Rev. 287, 293-294 (1968)
 
 
 [50]
 See note 42, supra, and accompanying text
 
 
 [51]
 See Bonbright, supra note 34, at 250-254, Leventhal, supra note 49, at 992-993
 
 
 [52]
 Protestants' expert testified that 'there is * * * a pretty well-founded theory, that if equity stock, common stock, is preceded by high debt ratio-- that (investors) * * * will want a somewhat higher earnings-price ratio because * * * they fear (the) * * * great leverage that those high preferred charges on income will have on their earnings.' Accordingly, he adjusted his recommended figure for return on equity capital to reflect the higher risk resulting from Transit's heavy debt capitalization. See also note 60, infra
 
 
 [53]
 Though the Commission did not so state in its opinion, there may be difficulties in applying to Transit an attraction-of-capital analysis utilizing earnings-price ratios, flowing from the fact that its stock is wholly owned by its parent Corporation, D.C. Transit of Delaware, and thus has no market price of its own. Other commissions have generally not found this an insuperable obstacle to utilization of an attraction-of-capital approach. See, e.g., authorities discussed in Nichols, Ruling Principles of Utility Regulation-- Rate of Return, 250-262 (1955); Nichols & Welch, Ruling Principles of Utility Regulation-- Rate of Return, 129-143 (Supp.A.1964). A witness in the 1963 proceeding testified that the publicly traded stock of D.C. Transit of Delaware was a 'good index' of Transit's cost of capital. A witness in the 1965 proceeding testified that 'as of the present * * * it is acceptable to ascertain the relevant data concerning D.C. Transit Company (Del.) and impute from that a cost of equity capital for the local company. This approach is followed in many rate proceedings where the equity capital of the company in question is wholly owned by the parent.' Moreover, though in a later proceeding the Commission declined to place substantial reliance on analyses of the market behavior of the stock of Transit's parent, see note 31, supra, at a later stage of the same proceeding the Commission adopted an approach which entailed a determination of Transit's cost of capital, though without reference to earnings-price ratios. Order No. 684, supra note 34
 Because of the extraordinary difficulties in determining cost of capital for a corporation which is part of an elaborate holding company structure, the Commission would no doubt be better able to fulfill its regulatory responsibilities were Transit to maintain a separate corporate existence. A suggestion to this effect, addressed by the Commission to Transit, might well be an appropriate means of alleviating some of the regulatory problems illustrated by this case. In Order No. 564, the Commission referred to the problem posed by integration of Transit's bus operations with non-transit operations, and urged the company to separate 'completely its transit and non-transit activities so that Transit's personnel will not be involved in non-transit functions.' (p. 4) This request was promptly complied with. (Order No. 656 p. 5)
 
 
 [54]
 Supra note 38
 
 
 [55]
 320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. 333
 
 
 [56]
 Bonbright, supra note 34, at 256-257; Leventhal, supra note 49, at 992
 
 
 [57]
 We readily admit, however, to considerable confusion as to the remainder of the Commission's enumerated list of 'other factors' (than cost of capital) it considers significant. One of the 'additional factors' listed, the 'ability to attract capital,' may simply be another way of denominating the cost of capital as derived from earnings-price ratios. See note 51, supra, and accompanying text. Others of the factors named-- the degree of risk, 'the economic conditions of both the market place and the community,' the 'efficiency of management,' and the need for a contribution to surplus to allow for forcasted capital expansion-- we understand to be considerations which the Commission might weigh in determining whether a particular return derived from an earnings-price analysis or a comparison of earnings of other companies would in fact provide Transit with a fair return. See Nichols, supra note 53, at 195-207; Nichols and Welch, supra note 53 at 78-79. The particular degree of risk borne by Transit's shareholders, for example, is a factor which must be evaluated by the Commission especially in applying the comparable earnings standard, but probably also in utilizing an attraction of capital approach which looks to earnings-price ratios of other companies. This is a matter requiring the exercise of informed judgment by the Commission, since it is no doubt impossible to find a company whose risk is identical to Transit's, and averaging figures for a number of companies tends to subsume differences in risk among the companies studied in a manner inconsistent with application of those figures to a particular company. But that does not make such inquiries irrelevant, nor does it relieve the Commission of the responsibility to reveal to a reviewing court the path it has followed, and the manner in which it has quantified its judgment
 
 
 [58]
 Commentators have differed as to whether the comparable earnings or the attraction-of-capital standard is the approach which should be given primary weight in a rate proceeding. Compare Leventhal, supra note 49, at 994-995 with Bonbright, supra note 34, at 257-258. We perceive no obstacle, and each of these commentators would apparently agree, to the employment of both methods in a given proceeding-- though, as we have noted, Transit's status as a subsidiary corporation may be a reason for placing less reliance on earnings-price statistics. See note 53, supra; see also Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (U.S.Apr. 30, 1968)
 
 
 [59]
 In addition to its reference to 'a comparison of earnings,' see In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 40, quoted in the text at note 28, supra
 
 
 [60]
 Transit's capital structure continues to be very heavily weighted in favor of debt, and, in fact, the percentage of debt capitalization apparently is still growing. In 1963, debt capital comprised 73.74% Of total capitalization; the corresponding figure for 1965 is 77.68%. In remanding, we observe that 'the desirable ratio of debt to equity' is one of the matters which 'must be prayerfully explored by the conscientious regulator before he can begin to say why he fixed upon 4.87 rather than 6.5 or 3.2.' 121 U.S.App.D.C. at 401, 350 F.2d at 779. A very high debt-equity ratio may have beneficial effects for the ratepayer, since debt capital costs less to acquire than equity capital, and since interest payments are deductible expenses for tax purposes while dividends are not. See In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 43. On the other hand, as the Commission recognized, ibid, a very high debt-equity ratio may increase the costs of both debt and equity capital. See note 52, supra. It may be that, on balance, a saving in total capital costs is effected by a high debt-equity ratio. But the Commission has not yet made the findings which would warrant such a conclusion
 
 
 [61]
 121 U.S.App.D.C. at 402, 350 F.2d at 780
 
 
 [62]
 Ibid
 
 
 [63]
 In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 43. Compare notes 30-33, supra, and accompanying text
 
 
 [64]
 Emphasis added. The Commission did not respond to our direction that it evaluate the level of returns now being earned by Transit in the light of current risks and other factors which would bear on their reasonableness, as contrasted with the conditions which prevailed when Transit began operations. We think it significant in this regard that when, in a later proceeding, the Commission did make such an analysis of current risks, it concluded:
 'The company faces less risk than most transit companies because of its size, its position in the holding company corporate structure of which it is a part, its prospects for future growth in its transit operations, and, finally, the cushion provided by the increasing value of its real estate. * * * In our view, the company presently faces less risks than it may have in the past.'
 Order No. 684, supra note 34.
 
 
 [65]
 Though the Hope Natural Gas case speaks of comparing earnings with those of companies 'having corresponding risks,' see text supra at note 55, that language should not be taken as placing upon the Commission the difficult, if not impossible, task of finding a company with identical risks. See Leventhal, supra note 49, at 998-1003, 1013-1016. Rather, a sensitive application of the comparable earnings approach embraces comparisons with companies having dissimilar risks, 'with appropriate adjustments for the differences involved.' Id. at 1003; see Permian Basin Area Rate Cases, supra note 58, 390 U.S. 747, 88 S.Ct. 1344. That the process demands the exercise of informed judgment does not, we stress, dispense with the need for reasoned analysis and findings. See note 57, supra
 
 
 [66]
 The calendar year 1963 was used as the future test period in this proceeding. In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 390
 
 
 [67]
 In fact, this prediction was probably quite accurate, since an exhibit in the record of the 1965 proceeding shows Transit's actual book equity in 1963 to have been $4,184,080
 
 
 [68]
 In remanding, we stressed the need for inquiry by the Commission into 'the cost to Transit of borrowing money,' and 'what Transit's future requirements in this regard are likely to be.' 121 U.S.App.D.C. at 401, 350 F.2d at 779. But though the Commission in its supplemental opinion purports to have computed a return sufficient, inter alia, 'to enable Transit to service its debt,' In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 41, nowhere in its opinion does there appear a finding as to the company's estimated debt expense for the future test period
 
 
 [69]
 The Commission made no finding as to the return on equity which would result from allowance of an overall return of $1,480,000; indeed, since it did not estimate the cost of servicing Transit's debt during the future annual period, see note 68, supra, it could not, as the following hypothetical example shows: Given a figure for book equity of $4,000,000 and an allowed total return of $1,000,000, the return to the equity holder would be $800,000, or 20%, if debt expense were $200,000; if debt expense were $800,000, the return to the equity holder would be only $200,000, or 5%
 'The return to each class of security holder is relevant in judging whether a given overall rate of return is reasonable. Due to the relatively low cost of debt financing, an overall rate of return of 5.6 per cent might yield a return to common stockholders of 6 or 7 per cent in a utility with little debt but yield a much higher return to common shareholders of a highly leveraged utility with a high percentage of debt in its capital structure. Neither the Commission nor the courts may ignore this fact.' City of Alton v. Commerce Comm'n, 19 Ill.2d 76, 165 N.E.2d 513, 519 (1960).
 Without having estimated Transit's debt, and having been disabled thereby from computing and evaluating the return to equity holder, we are at a loss to understand how the Commission could conclude that $1,480,786 is a 'fair and reasonable' margin of return.
 
 
 [70]
 This figure, as well as some of those that follow, is derived by averaging a group of figures set forth in an exhibit or exhibits
 
 
 [71]
 Emphasis added. Cf. Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of State of West Virginia, 262 U.S. 679, 692-693, 43 S.Ct. 675, 679, 67 L.Ed. 1176 (1923):
 'A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures.'
 One witness in the 1965 proceeding did testify that a return of 20.97% Would be 'low,' basing his conclusion on 'the high debt ratio of D.C. Transit and the risk associated in the transit industry generally and D.C. Transit in particular.' He added that in his opinion a return on equity of 25% Or 30% For Transit would be 'entirely reasonable.' However, he admitted on cross examination that he had never recommended, and knew of no proceeding in which had been granted, a return of 25% To 30%. And see note 64, supra. Order No. 684, supra note 34, the Commission permitted a return on equity of 14%.
 
 
 [72]
 FPC v. Hope Natural Gas Co., supra note 38, 320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. 333
 
 
 [73]
 See Atchison T. & S.F.R. Ry. v. United States, 295 U.S. 193, 201, 55 S.Ct. 748, 79 L.Ed. 1382 (1935); State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291 (1931); Anglo-Canadian Shipping Co. v. FMC, 310 F.2d 606, 617 (9th Cir. 1962); Bell Lines, Inc. v. United States, 263 F.Supp. 40, 44 (S.D.W.Va.1967). In view of our conclusion, see the text infra at , that there is no occasion for a further remand of this case, we do not consider whether we might properly make such a determination for the Commission's guidance in further proceedings. See Inland Motor Freight v. United States, 60 F.Supp. 520, 527 (E.D.Wash.1945)
 
 
 [74]
 See note 65, supra
 
 
 [75]
 See note 64, supra
 
 
 [76]
 Transit I, 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [77]
 In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, at 41
 
 
 [78]
 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [79]
 121 U.S.App.D.C. at 402, 350 F.2d at 780
 
 
 [80]
 'It appears to us likely that the Commission too narrowly conceived the scope of its inquiry under the operating ratio method, although, on this record, we can say only that the path it actually followed cannot confidently be discerned.' Transit I, 121 U.S.App.D.C. at 399-400, 350 F.2d at 777-778
 
 
 [81]
 See South Carolina Generating Co. v. FPC, 249 F.2d 755, 764 (4th Cir. 1957), cert. denied 356 U.S. 912, 78 S.Ct. 668, 2 L.Ed.2d 585 (1958)
 
 
 [82]
 See United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939); Braniff Airways v. CAB, 113 U.S.App.D.C. 132, 136, 306 F.2d 739, 743 (1962); Greensboro-High Point Airport Authority v. CAB, 97 U.S.App.D.C. 358, 363, 231 F.2d 517, 522 (1956); Spiegel v. Public Utils. Comm'n of Dist. of Columbia, 96 U.S.App.D.C. 307, 311, 226 F.2d 29, 33, cert. denied 350 U.S. 904, 76 S.Ct. 182, 100 L.Ed. 794 (1955); New York Cent. R.R. v. United States, 207 F.Supp. 483, 498 (S.D.N.Y.1962), vacated in part and remanded, sub nom. ICC v. Baltimore & O. R.R., 355 U.S. 175, 78 S.Ct. 189, 2 L.Ed.2d 183 (1957) (per curiam); New England Tel. & Tel. Co. v. Kennelly, 81 R.I. 1, 98 A.2d 835, 839 (1953)
 
 
 [83]
 See Mississippi River Fuel Corp. v. FPC, 82 U.S.App.D.C. 208, 224-225, 227, 163 F.2d 433, 449-450, 452 (1947); South Carolina Generating Co. v. FPC, supra note 81, 249 F.2d at 764; State Corp. Comm'n of Kansas v. FPC, 206 F.2d 690, 722-723 (8th Cir. 1953), cert. denied 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416 (1954); and see the cases cited in note 82, supra
 
 
 [84]
 See South Carolina Generating Co. v. FPC, supra note 81 (suspending Commission order and remanding for further explanation, because of apparent inconsistency in Commission's recognition of subsidiary corporation as separate entity for purposes of computing income tax expense, while fixing rate of return on system-wide basis); South Carolina Generating Co. v. FPC, 261 F.2d 915 (4th Cir. 1958) (refusing to accept explanation given by Commission on remand, and holding original action unlawful); see also In re South Carolina Generating Co., 22 F.P.C. 188 (1959)
 
 
 [85]
 We do not, we hasten to add, suggest improper motives or bad faith. 'However, an administrative decision which shows on the face of the order that it was made without due regard for the factors which were required to have been taken into account is just as void as an order made and entered by reason of improper proper motives.' Roseburg Lumber Co. v. Chambers, 223 Or. 294, 355 P.2d 606, 614 (1960)
 
 
 [86]
 We need not decide whether the absence of express findings in the Commission's order would itself warrant reversal. See, e.g., State of Florida v. United States, supra note 73, 282 U.S. at 215, 51 S.Ct. 119, 75 L.Ed. 291; Wichita R.R. & Light Co. v. Public Utils. Comm'n of State of Kansas, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124 (1922). For we think it is clear that agency action must be set aside as unlawful when the absence of findings reflects arbitrariness or misapplication of statutory standards. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (commission mistakenly thought it had unlimited discretion to choose either of two remedies, id. at 165, 83 S.Ct. 239; choice of remedy must be 'rational,' and based on 'conscious choice' and balancing of public interest, id. at 167, 83 S.Ct. 239; commission had not acted with 'discriminating awareness' of consequences of its action, id. at 176, 83 S.Ct. 239); Schaffer Transp. Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957); United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 488-489, 62 S.Ct. 722, 86 L.Ed. 971 (1942) ('likely' that 'an erroneous statutory construction lies hidden in vague findings;' the 'requirement (for findings) is not a mere formal one'); Saginaw Broadcasting Co. v. FCC, 68 U.S.App.D.C. 282, 287, 96 F.2d 554, 559, cert. denied 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938) (findings serve dual function of apprising parties and reviewing court of grounds of decision and, in addition, of guaranteeing that cases decided 'according to the evidence and the law, rather than arbitrarily or from extralegal considerations'); Tennessee Valley Authority v. United States, 96 F.Supp. 409 (N.D.Ala.1951); Louisville & Nashville R.R. v. United States, 268 F.Supp. 71 (W.D.Ky.1967) (order set aside as 'arbitrary' since 'it lacks a (stated) rational basis,' id. 268 F.Supp. at 75, and also because 'based upon a misinterpretation or misapplication of the relevant statutory provisions,' id. 268 F.Supp. at 79); North Carolina v. United States, 210 F.Supp. 675, rev'd on other grounds, 376 U.S. 93, 84 S.Ct. 564, 11 L.Ed.2d 541 (1964) (report of commission indicates that it did not take critical factor into account); Seatrain Lines, Inc. v. United States, 168 F.Supp. 819, 827 (S.D.N.Y.1958) (in addition to absence of findings, orders 'on their face affirmatively show' erroneous reliance on previous decision of commission); Long Island R.R. v. United States, 140 F.Supp. 823, 827, 828-829 (E.D.N.Y.1956); City of Alton v. Commerce Comm'n, supra note 69, 165 N.E.2d at 516 (parties and public have right 'not just to a reasonable determination but rather to a determination which arises from sound and lawful analysis of the problems presented'); Illinois Bell Tel. Co. v. Illinois Commerce Comm'n, 414 Ill. 275, 111 N.E.2d 329, 337 (1953); American Vitrified Prods. Co. v. Public Serv. Comm'n, 176 N.E.2d 145, 153 (Ind. App.1961); Roseburg Lumber Co. v. Chambers, supra note 85, 355 P.2d at 614; In re New England Tel. & Tel. Co., 115 Vt. 494, 66 A.2d 135 (1949) (commission order reversed since commission not only failed to set forth findings in its report, but refused to make findings on, inter alia, rate base and rate of return, in mistaken reliance on 'end result' test of FPC v. Hope Natural Gas Co., supra note 38); Commonwealth Tel. Co. v. Public Serv. Comm'n, 252 Wis. 481, 32 N.W.2d 247 (1948) (commission allowed 'reasonable profit,' but made no findings on rate base, in reliance on Hope Natural Gas Co., supra; order set aside as 'arbitrary and unlawful': 'it was not the intention of the legislature to bestow such arbitrary powers upon the Commission,' 32 N.W.2d at 248-249); see also Boudin v. Dulles, 98U.S.App.D.C. 305, 307-308, 235 F.2d 532, 534-535 (1956)
 
 
 [87]
 See, e.g., Burlington Truck Lines, Inc. v. United States, supra note 86, 371 U.S. at 176, 83 S.Ct. 239, 9 L.Ed.2d 207; State of Florida v. United States, supra note 73, 282 U.S. at 215, 51 S.Ct. 119, 75 L.Ed. 291; NLRB v. Capital Transit Co., 95 U.S.App.D.C. 310, 313, 221 F.2d 864, 867-868 (1955); Anglo-Canadian Shipping Co. v. FMC, supra note 73, 310 F.2d at 614, 618; Marine Transport Lines, Inc. v. United States, 173 F.Supp. 326, 330 (D.D.C.1959); Louisville & Nashville R.R. v. United States, supra note 86, 268 F.Supp. at 82-83; Seatrain Lines, Inc. v. United States, supra note 86, 168 F.Supp. at 827-828; Inland Motor Freight v. United States, supra note 73, 60 F.Supp. at 527; City of Alton v. Commerce Comm'n, supra note 69, 165 N.E.2d at 523; see also FTC v. Carter Prods., Inc., 346 U.S. 327, 74 S.Ct. 2, 98 L.Ed. 4 (1953) (per curiam); FPC v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 97 L.Ed. 15 (1952); EasternCentral Motor Carriers Ass'n v. United States, 321 U.S. 194, 210-212, 64 S.Ct. 499, 88 L.Ed. 668 (1944); Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n, 107 Utah 502, 155 P.2d 184, 188 (1945)
 
 
 [88]
 Washington Gas Light Co. v. Baker, 90 U.S.App.D.C. 98, 104, 195 F.2d 29, 35 (1951)
 
 
 [89]
 North Carolina v. United States, supra note 86, 210 F.Supp. at 689-690; see American Trucking Associations Inc. v. United States, 364 U.S. 1, 15-17, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960); General Utils. & Operating Co. v. Helvering, 296 U.S. 200, 207, 56 S.Ct. 185, 80 L.Ed. 154 (1935)
 
 
 [90]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, continuing, with one minor exception, the fares prescribed in In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2; In re D.C. Transit Sys., Inc. (Order No. 684), supra note 34, granting increase in token fares, and today affirmed in that respect in D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. ,
 
 
 [91]
 Compact, supra note 9, tit. II, art. XII, 6(a)(2). In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2, was entered April 12, 1963, and the fares prescribed therein were made effective April 14, 1963. In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, was entered January 26, 1966
 
 
 [92]
 Arizona Grocery Co. v. Atchison, T. & S.F. Ry., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932); Hope Natural Gas Co. v. FPC, 196 F.2d 803 (4th Cir. 1952); Georgia Pub. Serv. Comm'n v. Atlanta Gas Light Co., 205 Ga. 863, 55 S.E.2d 618 (1949); Michigan Bell Tel. Co. v. Michigan Pub. Serv. Comm'n, 315 Mich. 533, 24 N.W.2d 200 (1946)
 
 
 [93]
 Compact, supra note 9, tit. II, art. XII, 6(a)(2). It is true that the language of 6(a)(2) does not expressly deny to the Commission power to make new rates effective as of a date earlier than the issuance of its order. Compare Public Utils. Comm'n of Ohio v. United Fuel Gas Co., 317 U.S. 456, 464, 63 S.Ct. 369, 87 L.Ed. 396 (1943); Compact, supra note 9, tit. II, art. XII, 6(b). However, it is also true that the language used 'is not necessarily retroactive. It is as apt in reference to the future as it is to the past.' Transcontinental & West. Air, Inc. v. CAB, 83 U.S.App.D.C. 358, 360, 169 F.2d 893, 895 (1948), aff'd 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949). 'Retroactivity, even where permissible, is not favored, except upon the clearest mandate,' Claridge Apts. Co. v. Comm'r, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944), and in the situation here presented there is an 'almost conclusive presumption against power to take retroative action unless Congress plainly specifies such power,' Transcontinental & West. Air, Inc. v. CAB, supra, 83 U.S.App.D.C. at 359, 169 F.2d 894
 
 
 [94]
 Trans World Airlines, Inc. v. CAB, 336 U.S. 601, 605, 69 S.Ct. 756, 93 L.Ed. 911 (1949), affirming Transcontinental & West. Air, Inc. v. CAB, supra, note 93. We are aware that in an analogous context language similar to that employed in 6(a)(2) of the Compact has been construed to permit new rates to be made effective as of the date the application for a rate increase was filed. See Trans World Airlines, Inc. v. CAB, supra, 336 U.S. at 605, 69 S.Ct. 756, 93 L.Ed. 911, see also United States v. New York Cent. R.R., 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619 (1929). However, the presumption against retroactivity was there found to be rebutted, to that extent by clear indications of legislative intent in the history of the Act, see Trans World Airlines, Inc. v. CAB, supra, 336 U.S. at 605, 69 S.Ct. 756, 93 L.Ed. 911; Transcontinental & West. Air, Inc. v. CAB, supra note 93, 83 U.S.App.D.C. at 359-360, 169 F.2d at 894-895, and we have been unable to discover any such expression of legislative purpose to govern our resolution of the problem presented here. Moreover, there are important differences between mail pay regulation, involved in the above cases, and the setting of rates to be paid by the general public, see Delta Air Lines v. CAB, 108 U.S.App.D.C. 88, 90, 92, 280 F.2d 636, 638, 640, cert. denied 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 94 (1960), which militate against giving to the language of 6(a)(2) an interpretation similar to that accorded the statutory language involved in Trans World Airlines, Inc. v. CAB, supra. We also note that the Compact provides no mechanism whereby Commission power to adjust retroactively the rates charged to the busriding public could be made effective-- as, for example, by permitting the higher fares sought by the carrier to go into effect immediately subject to a contingent obligation, secured by a bond, to refund any excess of fares collected over those ultimately found to be just and reasonable. See, e.g., Hope Natural Gas Co. v. FPC, supra note 92, 196 F.2d at 805-806; City of New Haven v. New Haven Water Co., 132 Conn. 496, 45 A.2d 831 (1946); cf. Natural Gas Act 4(e), 15 U.S.C. 717c(e). Instead the Compact simply empowers the Commission to suspend the proposed tariff, and provides that the tariff shall 'take effect' unless suspended, or at the termination of the suspension period. Compact, supra note 9, tit. II, art. XII, 5(e), 6(a)(1), 6(a)(2); see Hope Natural Gas Co. v. EPC, supra note 92, 196 F.2d at 806-807. That no mechanism was provided for retroactive adjustment of rates may well reflect the different problem presented by bus riders on the one hand, and gas or electric customers on the other. Compare Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 232-233, 318 F.2d at 203-204 with Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 127, 188 F.2d 11, 23 (1950), cert. denied 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951). In this connection it is significant, we think, that in conferring power on the Commission to prescribe divisions, between carriers, of joint fares, the Compact expressly authorizes 'the adjustment of divisions * * * from the date of filing the complaint or entry of the order of investigation, or such other date subsequent thereto as the Commission finds to be just, reasonable and equitable.' Compact, supra note 9, tit. II, art XII, 7(c). Compare, Compact, supra note 9, tit. II, art. XII, 6(a)(2); see note 93, supra
 
 
 [95]
 'Remand to the Commission, in the circumstances of this case, could not be to enable a rate order to be superimposed upon the old application * * *.' Washington Gas Light Co. v. Baker, supra note 88, 90 U.S.App.D.C. at 104, 195 F.2d at 35; see Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 232-233, 318 F.2d at 203-204; see also Wisconsin v. FPC, 373 U.S. 294, 304-306, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963)
 
 
 [96]
 It is true that, were a remand here warranted for the purpose of enabling the Commission to enter a new rate order, and if the Commission's findings on remand encompassed an inquiry into conditions existing prior to the effective date of the new order, see Atlantic Coast Line R.R. v. State of Florida, 295 U.S. 301, 312, 55 S.Ct. 713, 79 L.Ed. 1451 (1935), we might take such findings into account in determining the question of restitution for amounts collected under the prior, ininvalid order, id. at 316, 55 S.Ct. 713, 79 L.Ed. 1451. And, were a remand to be ordered for such purpose, we might conceivably defer the question of restitution until such time as the Commission had entered its new order on remand. United States v. Morgan, supra note 82. But cf. Chicago, M. St.P. & P.R. R.R. v. Illinois, 356 U.S. 906, 78 S.Ct. 665, 2 L.Ed.2d 573 (1958); United Gas Co. v. Callery Properties, 382 U.S. 223, 229-230, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965). However, in both Morgan and Atlantic Coast Line there existed an independent jurisdiction basis for remand to the Commission, and the only question was the effect which should be given by the Court to the findings and determination of the Commission or administrator pursuant to the remand. The administrator in Morgan 'was free to make an order fixing rates for the future, and for that purpose or any other within the purview of the Act he is now free to determine a reasonable rate for the period antedating any order he may now make.' 307 U.S. at 192, 59 S.Ct. at 800, 83 L.Ed. 1211. To say that a reviewing court may sometimes give some retroactive effect to the eventual Commission order which, in respect of the Commission's authority is prospective only, is not at all to say that a remand is appropriate when the Commission's action could have no prospective effect. Cf. MontanaDakota Utils. Co. v. Northwestern Pub. Serv. Comm'n, 341 U.S. 246, 253-255, 71 S.Ct. 692, 95 L.Ed. 912 (1951); see note 95, supra. Moreover, it should be noted that in both Morgan and Atlantic Coast Line applicable statutory provisions, which have no equivalent in the Compact, supra note 9, expressly gave the administrator or Commission power to inquire into the past. See Morgan v. United States, supra note 82, 307 U.S. at 192 n. 3, 59 S.Ct. 795, 83 L.Ed. 1211; Natural Gas Pipeline Co. of America v. Harrington, 246 F.2d 915, 916 (5th Cir. 1957), cert. denied 356 U.S. 957, 78 S.Ct. 992, 2 L.Ed.2d 1065 (1958); see also FPC v. Hope Natural Gas Co., supra note 38, 320 U.S. at 618-619, 64 S.Ct. 281, 88 L.Ed. 333
 
 
 [97]
 Bebchick v. Public Util. Comm'n, supra note 94, 115 U.S.App.D.C. at 218-219, 232-233, 318 F.2d at 189-190, 203-204; Washington Gas Light Co. v. Baker, supra note 94, 88 U.S.App.D.C. at 127, 188 F.2d at 23. It is a 'principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby.' Arkadelphia Milling Co. v. St. Louis S.W. Ry., 249 U.S. 134, 135, 145, 39 S.Ct. 237, 242, 63 L.Ed. 517 (1919); Baltimore & Ohio R.R. v. United States, 279 U.S. 781, 785-786, 49 S.Ct. 492, 73 L.Ed. 954 (1929); Atlantic Coast Line R.R. v. State of Florida, supra note 96, 295 U.S. at 309, 55 S.Ct. 713, 79 L.Ed. 1451. This principle is no less applicable to erroneous orders of an administrative agency than to those of a court. United Gas Pipe Line Co. v. Mobile Gas. Co., 350 U.S. 332, 347, 76 S.Ct. 373, 100 L.Ed. 373 (1956); and see Atlantic Coast Line R.R. v. State of Florida, supra, 295 U.S. at 309-311, 55 S.Ct. 713, 79 L.Ed. 1451
 
 
 [98]
 ICC v. Hoboken Manufacturers' R.R., 320 U.S. 368, 381, 64 S.Ct. 159, 88 L.Ed. 107 (1943); FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); Board of Trade of Kansas City, Mo. v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432 (1942); Virginian Ry. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463 (1926); State Corp. Comm'n of Kansas v. United States, 184 F.Supp. 691, 696, 698 (D.Kan.1959); cf. Minneapolis & St. Louis Ry. v. United States, 361 U.S. 173, 189, 194, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); Gray v. Powell, 314 U.S. 402, 412-413, 62 S.Ct. 326, 86 L.Ed. 301 (1941); Moeller v. ICC, 201 F.Supp. 583, 589 (S.D.Iowa 1962). See also FPC v. Colorado-Interstate Gas Co., 348 U.S. 492, 501, 75 S.Ct. 467, 99 L.Ed. 583 (1955); Crowell v. Benson, 285 U.S. 22, 58, 52 S.Ct. 285, 76 L.Ed. 598 (1932)
 
 
 [99]
 Cf. Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n, supra note 87. There the utility had applied for a stay of a Commission order reducing intrastate telephone rates, which was granted on condition that the difference between existing rates and lower rates ordered by the Commission be impounded in a fund 'until final decision in this case.' When, after the order was set aside as arbitrary and remanded, the utility applied for release of the impounded funds, the court held in its favor, saying:
 'It is urged by the Commission that this court did not sustain the charges made by the utility pending review; that we in fact held that such charges were discriminatory. This position misconceives the function of this court in reviewing an order of the Commission. We, of course, in rendering our decision, acted within the scope of our authority. Consequently, we determined merely that the Commission had not regularly pursued its authority. Everything else stated in our opinion was in response to contentions of the plaintiff relative to confiscatory rates, arbitrary action by the Commission in respects other than those by us sustained, etc. But because we in the rationale of the opinion found that such contentions should be overruled, it does not follow that we determined that the rates charged by the utility were unjust, unreasonable or confiscatory. We did not so determine simply because that is not our function. Indeed, it is not a judicial function. It is legislative and is to be exercised by the arm of the legislature-- the Public Service Commission.' 155 P.2d at 187-188. See also Cole v. Young, 351 U.S. 536, 557, 76 S.Ct. 861, 100 L.Ed. 1396 (1956).
 
 
 [100]
 Until superseded by a valid order of the Commission, the rates on file prior to the application which preceded Order No. 245 were the only lawful rates. United Gas Pipe Line Co. v. Mobile Gas Corp., supra note 97, 350 U.S. at 347, 76 S.Ct. 373, 100 L.Ed. 373; Washington Gas Light Co. v. Baker, supra note 94, in which the Commission's order granting a fare increase was set aside and restitution ordered, because, inter alia, it had 'made no inquiry whatsoever into issues necessary to determination of a fair rate of return,' 88 U.S.App.D.C. at 20, 188 F.2d at 16; Saturn Oil & Gas Co. v. Northern Natural Gas Co., 359 F.2d 297 (8th Cir. 1966); Chicago, M., St.P. & P.R.R.R. v. Alouette Peat Products, 253 F.2d 449 (9th Cir. 1957); cf. Seatrain Lines v. United States, supra note 86, 168 F.Supp. at 827-828; Amarillo-Borger Express, Inc. v. United States, 138 F.Supp. 411 (N.D.Tex.1956), vacated and remanded as moot 352 U.S. 1028, 77 S.Ct. 594, 1 L.Ed.2d 598 (1957). See also Natural Gas Pipeline Co. v. Harrington, supra note 96. Some state courts have taken the view that the Commission-prescribed rates are conclusive during the period they are in effect, though later held to have been illegally established, if they are not stayed or suspended pending appeal. Mandel Bros. v. Chicago Tunnel Terminal Co., 2 Ill.2d 205, 117 N.E.2d 774 (1954); Keco Indus. v. Cinc. & Sub. Bell Tel. Co., 166 Ohio St. 254, 141 N.E.2d 465, appeal dismissed, cert. denied 355 U.S. 182, 78 S.Ct. 267, 2 L.Ed.2d 187 (1957). Compare Gulf, C & S.F. Ry. v. American Sug. Ref. Co., 130 S.W.2d 1030(Tex.Ct.Civ.App.1939). Any such contention in this case is clearly foreclosed by our decision in Bebchick v. Public Util. Comm'n, supra note 94, 115 U.S.App.D.C. at 218-219, 232-233, 318 F.2d at 189-190, 203-204
 
 
 [101]
 'There is no reason under the Act why a shipper should not be protected in the situation here existing where the rates are unlawful because not lawfully established just as he is protected in the situation where the rates are unlawful because unreasonable. In either case, the protection is against unlawful rates.' Chicago, M., St.P. & P.R. Co. v. Alouette Peat Products, supra note 100, 253 F.2d at 455
 
 
 [102]
 Bebchick v. Public Util. Comm'n, supra note 94; Washington Gas Light Co. v. Baker, supra note 94
 
 
 [103]
 Atlantic Coast Line R.R. v. State of Florida, supra note 97, 295 U.S. at 310, 55 S.Ct. 713, 79 L.Ed. 1451
 
 
 [104]
 Ibid
 
 
 [105]
 Ibid., citing Gould v. McFall, 118 Pa. 455, 12 A. 336, 337 (1888)
 
 
 [106]
 In Atlantic Coast Line R.R. v. State of Florida, supra note 97, the Court denied restitution altogether, since the Commission on remand had reached the same result, this time on the basis of adequate findings, thus enabling the Court to perceive 'that what was charged (under the original order) would have been lawful as well as fair if there had been no blunders of procedure, no administrative delays.' 295 U.S. at 315, 55 S.Ct. at 719, 79 L.Ed. 1451. The Court recognized that there was 'a possibility between * * * (the) extremers (of granting restitution in whole or not at all), a possibility exemplified in the decree of the court below.' Id. at 316-317, 55 S.Ct. at 719, 79 L.Ed. 1451. Though apparently not disapproving the District Court's disposition in principle, the Court observed that 'the present record does not satisfy us that a new scale should be set up to govern claims for restitution.' Id. at 317, 55 S.Ct. at 720, 79 L.Ed. 1451. The apparent reason for rejecting the District Court's solution was the availability of the Commission's later order which reaffirmed its original action on the basis of adequate findings and was thus entitled to 'great respect.' Ibid. In view of our disposition of Orders 245, 563 and 564, we are without the means to perceive the reasonableness of the fares collected during the period in question. See also notes 116, 117, infra, and accompanying text. Nevertheless, we see no obstacle to our permitting the company to retain some, though not all, of the proceeds of the fare increase if there is reliable evidence suggesting that it would be inequitable to compel restitution in a greater amount. 'Restitution is granted to the extent and only to the extent that justice between the parties requires.' Restatement, Restitution, ch. 8 at 596 (1937)
 
 
 [107]
 Blair v. Freeman, 125 U.S.App.D.C. 207, 217-218, 370 F.2d 229, 239-240 (1966); see United States v. Morgan, supra note 82
 
 
 [108]
 Atlantic Coastline R.R. v. State of Florida, supra, note 97, 295 U.S. at 315, 55 S.Ct. at 719, 79 L.Ed. 1451
 
 
 [109]
 See note 106, supra see also notes 116, 117, infra, and accompanying text
 
 
 [110]
 In re D.C. Transit Sys. Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 408. Compare Atlantic Coast Line R.R. v. State of Florida, supra note 97, 295 U.S. at 313, 55 S.Ct. 713, 79 L.Ed. 1451
 
 
 [111]
 See In re D.C. Transit Sys., Inc. (Order No. 563), supra note 10, 63 P.U.R.3d at 39
 
 
 [112]
 This figure results from dividing the average book equity figure set by the protestants, see note 67, supra and accompanying text, by $937,669, see note 68, supra and accompanying text
 
 
 [113]
 See notes 44-47, supra and accompanying text
 
 
 [114]
 Order No. 684, supra note 34
 
 
 [115]
 D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. , note 90
 
 
 [116]
 In Atlantic Coast Line R.R. v. State of Florida, supra note 97, 295 U.S. at 316, 55 S.Ct. at 719, 79 L.Ed. 1451, the Court noted that 'nowhere in the record is there a suggestion on the part of any one that during this long litigation there has been any change of conditions * * *. What was injustice at the date of the second order of the Commission is shown beyond a doubt to have been injustice also at the first.' In this case, involving the finances of a single company, we could not be certain 'beyond a doubt' that conditions had not changed between 1963 and 1967. Cf. Bell v. United States, 49 F.Supp. 505, 508 (E.D.La.1943)
 
 
 [117]
 Compare Atlantic Coast Line R.R. v. State of Florida, supra note 97, 295 U.S. at 312-313, 55 S.Ct. 713, 79 L.Ed. 1451
 
 
 [118]
 Cf. Wisconsin v. FPC, supra note 95. There, proposed rate increases filed by the carrier pursuant to 4(e) of the National Gas Act, 15 U.S.C. 717c(e), had gone into effect at the end of the suspension period, subject to a refund obligation. These rate increases were later superseded, thus becoming 'locked-in.' The Commission terminated the 4(e) proceedings, thus allowing the rate increases to remain effective during the 'locked-in' period, when it found that the increased revenues generated by the higher fares had not been sufficient to cover the company's computed cost of service for the historical test period, and thus that no refunds were due. The Supreme Court affirmed, 373 U.S. at 304-306, 83 S.Ct. 1266, 10 L.Ed.2d 357. See also Michigan Wisconsin Pipe Line Co. v. FPC, 263 F.2d 553, 555-556 (6th Cir. 1959)
 
 
 [119]
 West Ohio Gas Co. v. Public Utils. Comm'n, 294 U.S. 79, 82, 55 S.Ct. 324, 79 L.Ed. 773 (1935); see Trans World Airlines, Inc. v. CAB, 128 U.S.App.D.C. 126, 134, 385 F.2d 648, 656 (1967), cert. denied 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (Mar. 5, 1968); Summerfield v. CAB, 92 U.S.App.D.C. 248, 252-253, 207 F.2d 200, 203-205 (1953), aff'd sub nom. Western Airlines, Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1954)
 
 
 [120]
 See Wisconsin v. FPC, supra note 95; Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 142, 161-162, 51 S.Ct. 65, 75 L.Ed. 255 (1930); Southwestern Bell Tel. Co. v. Kansas State Corp. Comm'n, 53 P.U.R.3d 337 (Kan.Sup.Ct.1964); City of Pittsburgh v. Pennsylvania Pub. Utils. Comm'n, 169 Pa.Super. 400, 82 A.2d 515, 519-520 (1951). But see State Corp. Comm'n of Kansas v. FPC, 215 F.2d 176, 183-184 (8th Cir. 1954)
 
 
 [121]
 That is, the period during which Order No. 245, In re D.C. Transit Sys., Inc., supra note 2, was in effect. See notes 90, 91, supra
 
 
 [122]
 In re D.C. Transit Sys., Inc. (Order No. 684), supra note 34; see text accompanying notes 114, 115, supra
 
 
 [123]
 Atlantic Coast Line R.R. v. State of Florida, supra note 96, 295 U.S. at 317, 55 S.Ct. at 720, 79 L.Ed. 1451
 
 
 [124]
 See Transit I, supra note 1, 121 U.S.App.D.C. at 390-391, 350 F.2d at 768-769, Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 220-221, 318 F.2d at 191-192
 
 
 [125]
 See Transit I, supra note 1, 121 U.S.App.D.C. at 390-391, 350 F.2d at 768-769, Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 220-221, 318 F.2d at 191-192
 
 
 [126]
 In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 394; Order No. 3592 (unreported) (PUC 1957), quoted in In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 394. See also Transit I, supra note 1, 121 U.S.App.D.C. at 390, 350 F.2d at 768; Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 220-221, 318 F.2d at 191-192
 
 
 [127]
 Transit I, supra note 1, 121 U.S.App.D.C. at 390, 350 F.2d at 768; Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 220-221, 318 F.2d at 191-192
 
 
 [128]
 In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 394
 
 
 [129]
 See Franchise Act 7, 70 Stat. 598 (1956). See also Transit I, supra note 1, 121 U.S.App.D.C. at 390, 350 F.2d at 768; Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 220-221, 318 F.2d at 191-192
 
 
 [130]
 In re D.C.Transit Sys., Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 395-397
 
 
 [131]
 Id. at 395
 
 
 [132]
 Id. at 394
 
 
 [133]
 Ibid
 
 
 [134]
 Id. at 395
 
 
 [135]
 Ibid
 
 
 [136]
 121 U.S.App.D.C. at 390-391, 350 F.2d at 768-769
 
 
 [137]
 Order No. 385 (unreported) (WMATC 1964)
 
 
 [138]
 Order No. 385 stated that the then balance of $2,713,484 was subject to an adjustment of $194,539 for a tax settlement and other costs related to the acquisition agreement, leaving $2,519,458 to be amortized
 
 
 [139]
 Order No. 385 (unreported) (WMATC 1964)
 
 
 [140]
 After tax adjustments to the acquisition adjustment account, its annual amortization figure under the original ten-year plan would have been $959,793 through August 15, 1966. In consequence of the Commission's change, the amount of the annual amortization became $199,561. In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 49
 
 
 [141]
 Transit I, supra note 1, 121 U.S.App.D.C. at 390, 350 F.2d at 768
 
 
 [142]
 Order No. 385 (unreported) (WMATC 1964)
 
 
 [143]
 Transit I, supra note 1, 121 U.S.App.D.C. at 390, 350 F.2d at 768
 
 
 [144]
 Order No. 406 (umreported) (WMATC 1964)
 
 
 [145]
 In re D.C. Transit Sys. Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 49-50. And see Jason v. Summerfield, 94 U.S.App.D.C. 197, 199-200, 214 F.2d 273, 275-276, cert. denied 348 U.S. 840, 75 S.Ct. 48, 99 L.Ed. 662 (1954); Niagara Mohawk Power Corp. v. FPC, 91 U.S.App.D.C. 395, 402, 202 F.2d 190, 198 (1952), aff'd 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 666 (1954); Churchill Tabernacle v. FCC, 81 U.S.App.D.C. 411, 413, 160 F.2d 244, 246 (1947)
 
 
 [146]
 See the text supra at notes 126 and 127
 
 
 [147]
 By January 1, 1964, the original acquisition adjustment balance of $10,339,041 had been reduced to $2,519,484. Thus 24.4% Of the balance remained unamortized, while 22.7% Of the acquired depreciable properties were still in service. And see note 148, infra. It is interesting to note that while the original amoritzation term was fixed to coincide with the ten-year period for accruals to the track removal and street repaving reserve, the unamortized acquisition adjustment balance, on the date of changeover to the new plan, was fairly close to what it would have been had the amortization been tied entirely to the depreciable lives of the acquired assets
 
 
 [148]
 The acquisition adjustment balance on January 1, 1964, was $2,344,990 according to Transit, but $2,519,484 according to the Commission. And while Transit's calculation would have reduced the annual amortization to $193,011, the figure the Commission arrived at was $199,561
 
 
 [149]
 The service lifetimes of certain of Transit's properties extend beyond the term of its franchise, while the Commission's change compresses the amortization within the remaining period of the franchise. But according to the testimony of Transit's vice president and comptroller, this factor would make the percentages we recite only 'slightly higher' than they would otherwise be
 
 
 [150]
 This divergence would have been avoided had the Commission adopted the procedure recommended by its staff. In Order No. 385 the Commission said:
 'The Commission staff has related the balance in the Acquisition Adjustment Account to the properties acquired on August 15, 1956, which are still in service and subject to depreciation at their original cost. The staff then projected retirement dates for these properties and calculated an amortization schedule based on such projections, cutting off at August 15, 1976, as the expiration date of the franchise. This produced an uneven and constantly reducing amount of amortization per year; it also would be subject to change as projected retirements materialized earlier or later than scheduled. These characteristics are the major disadvantages of this plan of amortization; they could be avoided, and the recurring credits smoothed out, if the amortization were placed on a straight-line basis.'
 
 
 [151]
 This is our computation based, of course, upon the record data. And see note 149, supra
 --------------------------------------------
 At The End of
 -------------------
 1963 1966 1970
--------------------------------------------
Unretired Properties 22.7% 8.8% 2.4%
Unamortized Acquisition
 Adjustment Balance 24.4% 18.6% 10.8%
--------------------------------------------
 
 
 [152]
 Order No. 385 (unreported) (WMATC 1964)
 
 
 [153]
 See note 86, supra, and accompanying text
 
 
 [154]
 See the text at note 15, supra, and notes 190 to 195, infra
 
 
 [155]
 The $760,232 is the difference between $959,793 (the original $1,033.904 as adjusted by Order No. 385), which would have been the amount of annual amortization under the old ten-year plan, and $199,561, which was the figure under the new plan. See the text supra at note 140
 
 
 [156]
 See note 7, supra
 
 
 [157]
 See note 155, supra
 
 
 [158]
 See note 7, supra
 
 
 [159]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 58
 
 
 [160]
 The $475,145 is the $760,232 difference between old and new annual amortization amounts, see note 155, supra, for the seven and one-half months of 1966 to August 15 of that year when the old ten-year period would have expired
 
 
 [161]
 See FPC v. Natural Gas Pipeline Co., supra note 98, 315 U.S. at 592-593, 594, 62 S.Ct. 736, 86 L.Ed. 1037; Dayton Power & Light Co. v. Public Utils. Comm'n, 292 U.S. 290, 303-305, 54 S.Ct. 647, 78 L.Ed. 1267 (1934); Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 167-169, 174-175, 54 S.Ct. 658, 78 L.Ed. 1182 (1934); Clark's Ferry Bridge Co. v. Public Serv. Comm'n, 291 U.S. 227, 239, 54 S.Ct. 427, 78 L.Ed. 767 (1934); Smith v. Illinois Bell Tel. Co., supra note 120, 282 U.S. at 158, 51 S.Ct. 65, 75 L.Ed. 255; United Rys. & Elec. Co. of Baltimore v. West, 280 U.S. 234, 254, 50 S.Ct. 123, 74 L.Ed. 390 (1930), disapproved on another point FPC v. Hope Natural Gas Co., supra note 38, 320 U.S. at 606-607, 64 S.Ct. 281, 88 L.Ed. 333; Kansas City So. Ry. v. United States, 231 U.S. 423, 446, 34 S.Ct. 125, 58 L.Ed. 296 (1913) quoting Illinois Cent. R.R. v. ICC, 206 U.S. 441, 462, 27 S.Ct. 700, 51 L.Ed. 1128 (1907); City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 13-15, 29 S.Ct. 148, 53 L.Ed. 371 (1909)
 
 
 [162]
 Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 224, 318 F.2d at 195. See also Washington Gas Light Co. v. Baker, supra note 94, 88 U.S.App.D.C. at 121-126, 188 F.2d at 17-22
 
 
 [163]
 See note 147, supra
 
 
 [164]
 See the text accompanying notes 125 to 127, supra
 
 
 [165]
 Order No. 381 (unreported) (WMATC Sept. 11, 1964). After reducing the reserve by $580,658 to reflect the removal of obsolete equipment from Transit's accounts, the amount of the deficiency was fixed at $1,223,099
 
 
 [166]
 Order No. 381 (unreported) (WMATC Sept. 11, 1964)
 
 
 [167]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 56-57. The suspense account balance had declined from its original size, see supra note 165, as a result of salvage credits. Id. at 56
 
 
 [168]
 An entry 'above the line' classifies a current revenue or expense item, and thus affects profit or loss. An entry 'below the line' classifies a nonrecurring revenue or expense item, and thus effects only a capital adjustment
 
 
 [169]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 57
 
 
 [170]
 Id. at 68
 
 
 [171]
 See the text supra at note 15
 
 
 [172]
 See the text infra at notes 190 to 199
 
 
 [173]
 See note 168, supra
 
 
 [174]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at. 57
 
 
 [175]
 Id. at 57
 
 
 [176]
 Ibid
 
 
 [177]
 See note 7, supra
 
 
 [178]
 The Commission describes its findings 'in relation to the operating forecast projected for 1966' as 'incorporating all of the foregoing adjustments,' In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 58, and included in those adjustments are those pertaining to the depreciation deficiency
 
 
 [179]
 See the text accompanying note 161, supra
 
 
 [180]
 See In re Alpena Power Co., 85 P.U.R. (n.s.) 89, 91-92 (Mich.1950); In re Narragansett Elec. Co., 21 P.U.R.3d 113, 133-134 (R.I.1957). See also Pacific Tel. & Tel. Co., 5 P.U.R.3d 396, 415-418 (Cal.1954); In re Michigan Consol. Gas Co., 9 P.U.R.3d 433, 440-442 (Mich.1955)
 
 
 [181]
 Judicial review of a Commission order is conditioned upon presentation to and determination by the Commission of an application for reconsideration. Compact, supra note 9, tit. II, art. XII, 16. The application must 'state specifically the errors claimed as grounds for such reconsideration,' and 'no person shall in any court urge or rely on any ground not so set forth in such application.' Ibid. See also United States v. L. A. Tucker Lines, Inc., 344 U.S. 33, 36-37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); Unemployment Compensation Comm'n of Territory of Alaska v. Aragan, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946)
 Petitioners' application for reconsideration of Order No. 564, which was denied, alleged error, inter alia, in the Commission's direction 'that $806,168 be removed from the Court Ordered Reserve to restore the deficiency in the depreciation reserve.' As do the parties, we deem the claim of error to have been asserted administratively in suitable procedural form, compare United States v. Great Northern Ry., 343 U.S. 562, 567 n. 3, 72 S.Ct. 985, 96 L.Ed. 1142 (1952); Baltimore & O. R.R. v. United States, 298 U.S. 349, 369-72, 56 S.Ct. 797, 80 L.Ed. 1209 (1936), and to have been fittingly brought here by an incorporating reference in the petition for review and by reiteration in the parties' prehearing stipulation of the issues we are to decide. Cf. Helvering v. Fuller, 310 U.S. 69, 76, 60 S.Ct. 784, 84 L.Ed. 1082 (1940).
 This error, we believe, was identified with requisite specificity and yet its assignment was broad enough to challenge the propriety of the charge to farepayers of any portion whatsoever of the deficiency. Cf. FPC v. Colorado-Interstate Gas Co., supra note 98, 348 U.S. at 497-499, 75 S.Ct. 467, 99 L.Ed. 583; Halsted v. SEC, 86 U.S.App.D.C. 352, 361-362, 182 F.2d 660, 669-670, cert. denied 340 U.S. 834, 71 S.Ct. 68, 95 L.Ed. 612 (1950). Moreover, petitioners would not, in their endeavors to support any ground submitted for the Commission's reconsideration, be confined to precisely the same reasons or argument advanced before the Commission, see Dewey v. City of Des Moines, 173 U.S. 193, 197, 19 S.Ct. 379, 43 L.Ed. 665 (1899); Chase Nat. Bank of City of New York v. United States, 116 F.2d 625, 627-628 (2d Cir. 1940), and by the same token we would not be either.
 In any event, Order No. 564 must be remanded to the Commission anyway, see pt. VIII, infra, whereupon the justice of assessing any of the deficiency to the farepayers can be fully restudied. That question touches the public at large, and the Commission should look beyond the immediate concerns of the parties to the more general welfare, even in situations, more exaggerated than that here, where those who might have objected remained completely silent. Indeed, 'there may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below.' Hormel v. Helvering, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). See also United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936). We deem it appropriate here to discuss the principle which should guide the Commission on remand in ascertaining where the burden of the deficiency should equitably rest. Compare Coffey v. Jordan, 107 U.S.App.D.C. 113, 114-115, 275 F.2d 1, 2-3 (1959); Ward v. Anderson, 93 U.S.App.D.C. 156, 158-159, 208 F.2d 48, 50 (1953).
 
 
 [182]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 57
 
 
 [183]
 'If the factual premise is true, that is, if past earnings were not sufficient to compensate investors for inadequate depreciation charges, then the Commission may properly require the burden to be borne by consumers or to be shared by investors and consumers depending upon the circumstances.' Washington Gas Light Co. v. Baker, supra note 94, 88 U.S.App.D.C. at 125, 188 F.2d at 21
 
 
 [184]
 Supra note 94
 
 
 [185]
 88 U.S.App.D.C. at 125, 188 F.2d at 21
 
 
 [186]
 Id. at 125, 188 F.2d at 21, quoting Lindheimer v. Illinois Bell Tel. Co., supra note 161, 292 U.S. at 164, 54 S.Ct. 663, 78 L.Ed. 1182
 
 
 [187]
 See note 86, supra, and accompanying text
 
 
 [188]
 In order No. 245, the Commission examined the returns earned by Transit and its predecessor companies over a 28-year period for purposes of determining whether Transit's investors had been compensated for assuming the risk of obsolescence of abandoned rail properties. In the Commission's view 'the returns earned (during this period) were generally below the rates of return established as being reasonable by the regulatory body' and 'the regulatory authority, in fixing the rates of return * * * did not allow any additional compensation for the risk of obsolescence.' In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 402. We affirmed the Commission in that respect. Transit I, supra note 1, 121 U.S.App.D.C. at 395 n. 47, 350 F.2d at 773 n. 47. We cannot regard the circumstance that the returns earned over a 28-year period were 'generally below' the levels administratively fixed as reasonable, as a demonstration that, during the particular periods the properties insufficiently depreciated were in service, there were no excesses of earnings over fair returns as would wholly or partially provide reimbursement for the depreciation deficiency
 
 
 [189]
 As we have observed, see supra note 165, some of the depreciation deficiency represented obsolete equipment that was eliminated from Transit's accounts. In Washington Gas Light Co. v. Baker, supra note 94, 88 U.S.App.D.C. at 123, 188 F.2d at 19, we pointed out that 'it * * * becomes relevant to determine whether or not investors have, during the useful life of (abandoned) property, been compensated for assuming the risk that it would become inadequate or obsolete before the investment in it was entirely recovered.' See also Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 224, 318 F.2d at 195. It may be that in this case the investors have not been so reimbursed. See note 188, supra, and compare note 167, supra. The evidence, however, is hazy in this respect, and in any event 'that is an inquiry which must be made in the first instance by the Commission.' Washington Gas Light Co. v. Baker, supra note 94, 88 U.S.App.D.C. at 124, 188 F.2d at 20. This the Commission must do following our remand
 
 
 [190]
 Bebchick v. Public Utils. Comm'n, supra note 15
 
 
 [191]
 Id. at 232, 318 F.2d at 203
 
 
 [192]
 Ibid
 
 
 [193]
 Id. at 232-233, 318 F.2d at 203-204
 
 
 [194]
 Id. at 233, 318 F.2d at 204
 
 
 [195]
 The $2,350,000 credit in the reserve included $1,318,612 required by our supplemental opinion in Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 232-233, 318 F.2d at 203-204. The remainder reflected a settlement by the parties of litigation involving the Commission's intervening rate Order No. 4735 (1961) mentioned in that opinion. The reserve credit was created by reductions of $500,000 in Transit's earned surplus, $1,000,000 in its depreciation reserve, and $850,000 in the reserve for track removal and repaving. Bebchick v. Public Utils. Comm'n, Civil No. 1529-60 (D.D.C. Sept. 10, 1963)
 
 
 [196]
 Compare the text accompanying note 197, infra
 
 
 [197]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 57
 
 
 [198]
 Compare Dayton Power & Light Co. v. Public Utils. Comm'n, supra note 161, 292 U.S. at 305, 54 S.Ct. 647, 78 L.Ed. 1267
 
 
 [199]
 This we say in full realization that the Commission, in administering the court-ordered reserve, acts more nearly as a trustee to implement judicial directives concerning the use of the fund than in the exercise of its statutory regulatory powers. See the text accompanying note 194, supra
 
 
 [200]
 See the text supra at notes 173 and 174
 
 
 [201]
 These properties were limousines which, though operating properties, were not and are not devoted to public use
 
 
 [202]
 'The commission, after considering all the testimony on the subject in this case, agrees with the logic and the conclusion that $293,459 of this deficiency would be shared by the buildings which contributed to this deficiency, and which have, since August 15, 1963, been placed below the line.' In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 57
 
 
 [203]
 See the cases cited supra note 180
 
 
 [204]
 See the text supra at notes 184 to 189
 
 
 [205]
 26 U.S.C. 38, 46-48
 
 
 [206]
 Transit used investment credits of $117,843 for 1962, $123,667 for 1963, and $90,640 for 1964. No credit was expected to be used for 1965 because a loss from operations was anticipated. For 1966, the credit to be generated during that year, together with a carry-forward available from previous years, gave Transit an estimated total credit of $685,608
 
 
 [207]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 58. The Commission added, however, that 'any benefits flowing to Transit from these investment tax credits will not be ignored by the Commission in any cash flow considerations.' Ibid
 
 
 [208]
 'It was the intent of Congress in providing an investment credit under Section 38 of the Internal Revenue Code of 1954, and it is the intent of the Congress in repealing the reduction in basis required by section 48(g) of such Code, to provide an incentive for modernization and growth of private industry (including that portion thereof which is regulated). Accordingly, Congress does not intend that any agency or instrumentality of the United States having jurisdiction with respect to a taxpayer shall, without the consent of the taxpayer, use--
 '(1) in the case of public utility property (as defined in section 46(c)(3)(B) of the Internal Revenue Code of 1954), more than a proportionate part (determined with reference to the average useful life of the property with respect to which the credit was allowed) of the credit against tax allowed for any taxable year by section 38 of such Code or '(2) in the case of any other property, any credit against tax allowed by section 38 of such Code,
 to reduce such taxpayer's Federal income taxes for the purpose of establishing the cost of service of the taxpayer or to accomplish a similar result by any other method.' 26 U.S.C.A. 38 note, 'Treatment of Investment Credit by Federal Regulatory Agencies.'
 
 
 [209]
 Ibid. No 'public utility property,' within the meaning of Section 203(e), see note 208, supra, is involved here because the quoted term does not include property used in furnishing a passenger transportation service. 26 U.S.C. 46(c)(3)(B)
 
 
 [210]
 North Cent. Airlines v. CAB, 124 U.S.App.D.C. 251, 363 F.2d 983 (1966). See also Trans World Airlines v. CAB, supra note 119, 128 U.S.App.D.C. at 146, 385 F.2d at 668
 
 
 [211]
 Supra note 208
 
 
 [212]
 Supra note 9
 
 
 [213]
 74 Stat. 1031 (1960), D.C.Code 1-1410 (1967) ed.); 76 Stat. 765 (1962), D.C.Code 1-1410a (1967 ed.)
 
 
 [214]
 74 Stat. 1031 (1960), preamble
 
 
 [215]
 Compact, supra note 9, tit. I, art. II
 
 
 [216]
 Prominent examples are: The Commission is composed of three members, one of whom is appointed by the chief executive authority of each signatory from the agency of that signatory having jurisdiction over the regulation of mass transit within its borders. Tit. I, art. III, 1. The Commission's expenses are borne by the three signatories. Tit. I, art. IV. The signatories by their joint action, may amend the Compact without prior congressional approval, and the amendment is effective unless within one year thereof it is disapproved by Congress. Tit. I, art. IX, 1. Any signatory may withdraw, and thereby terminate the Compact, upon one year's written notice to the other signatories. Tit. I, art. IX, 2
 
 
 [217]
 Compare DeVeau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1959); Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); Bell v. Waterfront Comm'n of New York Harbor, 279 F.2d 853 (2d Cir. 1960); Rivoli Trucking Corp. v. American Export Lines, 167 F.Supp. 937, 939 (E.D.N.Y.1958); Bolger v. United States, 189 F.Supp. 237, 256 (S.D.N.Y.1960), rev'd on other grounds sub nom. Cleary v. Bolger, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963). See also Miller v. City of Greenville, 138 F.2d 712, 717-718 (8th Cir. 1943); Pearl v. United States, 230 F.2d 243, 244-245 (10th Cir. 1956)
 
 
 [218]
 City of Chicago v. FPC, 128 U.S.App.D.C. 107, 385 F.2d 629, 635 (1967)
 
 
 [219]
 See Minneapolis & St. L. Ry. v. United States, supra note 98, 361 U.S. at 186, 80 S.Ct. 229, 4 L.Ed.2d 223; United States v. Radio Corp. of America, 358 U.S. 334, 351-352, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); McLean Trucking Co. v. United States, 321 U.S. 67, 79-80, 64 S.Ct. 370, 88 L.Ed. 544 (1944); National Broadcasting Co. v. United States, 319 U.S. 190, 222-224, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Southern S.S. Co. v. NLRB, 316 U.S. 31, 47, 62 S.Ct. 886, 86 L.Ed. 1246 (1942); City of Chicago v. FPC, supra note 218, 385 F.2d at 635; City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 126, 237 F.2d 741, 754 (1956); City of Detroit v. FPC, 97 U.S.App.D.C. 260, 272, 230 F.2d 810, 822 (1955), cert. denied 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956). Cf. Trans World Airlines v. CAB, supra note 119, 385 F.2d at 668
 
 
 [220]
 See the text supra at note 207
 
 
 [221]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 58
 
 
 [222]
 Ibid
 
 
 [223]
 Supra note 219. See also the opinion following remand, 99 U.S.App.D.C. 163, 238 F.2d 24 (1956)
 
 
 [224]
 FCC v. RCA Communications, Inc., supra note 219, 346 U.S. at 89, 73 S.Ct. at 1001
 
 
 [225]
 Id. at 91, 73 S.Ct. at 1002
 
 
 [226]
 Id. at 94, 73 S.Ct. at 1004
 
 
 [227]
 Id. at 95, 73 S.Ct. at 1004
 
 
 [228]
 Id. at 96, 73 S.Ct. at 1004
 
 
 [229]
 Ibid. The Court had previously stated that 'that there is a national policy favoring competition cannot be maintained today without careful qualification,' id. at 91, 73 S.Ct. at 1003, while the congressional policy behind Section 203(e) is clear, see supra note 207 and accompanying text. We do not consider this difference a distinguishing factor insofar as the Commission's duty to use its own discretion is concerned
 
 
 [230]
 City of Chicago v. FPC, supra note 218, 385 F.2d at 635-638; Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d 318, 331, 335 (5th Cir.), cert. denied 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). See also Panhandle Eastern Pipe Line Co. v. FPC, 115 U.S.App.D.C. 8, 11-12, 316 F.2d 659, 662-663 (en banc), cert. denied 375 U.S. 881, 84 S.Ct. 147, 11 L.Ed.2d 111 (1963); City of Detroit v. FPC, supra note 219, 97 U.S.App.D.C. at 271-272, 230 F.2d at 821-822
 
 
 [231]
 See North Cent. Airlines v. CAB, supra note 210, 124 U.S.App.D.C. at 253, 363 F.2d at 985
 
 
 [232]
 S.Rep. No. 1881, 87th Cong., 2d Sess. 11 (1962); H.R. Rep. No. 1447, 87th Cong., 2d Sess. 8 (1962); H.R. Rep. No. 2508, 87th Cong., 2d Sess. 14 (1962). See also H.R. Rep. No. 749, 88th Cong., 1st Sess. 36 (1963); S.Rep. No. 830, 88th Cong., 2d Sess. 42 (1964)
 
 
 [233]
 S.Rep. No. 1881, 87th Cong., 2d Sess. 11 (1962). North Cent. Airlines v. CAB, supra note 210, 124 U.S.App.D.C. at 253, 363 F.2d at 985
 
 
 [234]
 FPC v. United Gas Pipe Line Co., 386 U.S. 237, 244, 87 S.Ct. 1003, 1007, 18 L.Ed.2d 18 (1967). See also City of Chicago v. FPC, supra note 218, 385 F.2d at 633, quoting In re United Fuel Gas Co., 12 F.P.C. 251, 265 (1953); Trans World Airlines v. CAB, supra note 119, 385 F.2d at 668
 
 
 [235]
 Panhandle Eastern Pipe Line Co. v. FPC, 113 U.S.App.D.C. 94, 97, 305 F.2d 763, 766 (1962), cert. denied 372 U.S. 916, 83 S.Ct. 719, 9 L.Ed.2d 722 (1963). As we have had occasion to say, 'tax statutes are not decisive as to the administration of other Government programs,' Trans World Airlines v. CAB, supra note 119, 385 F.2d at 666, and 'what Congress provides in a tax statute does not necessarily control in the implementation of federal regulatory statutes.' City of Chicago v. FPC, supra note 218, 385 F.2d at 635. See FPC v. United Gas Pipe Line Co., supra note 234; Alabama-Tennessee Natural Gas Co. v. FPC, supra note 230, 359 F.2d at 335; El Paso Natural Gas Co. v. FPC, 281 F.2d 567, 573 (5th Cir. 1960), cert. denied 366 U.S. 912, 8u S.Ct. 1083, 6 L.Ed.2d 236 (1961)
 
 
 [236]
 Compare Panhandle Eastern Pipe Line Co. v. FPC, supra note 230, 115 U.S.App.D.C. at 11, 12, 316 F.2d at 662, 663; City of Detroit v. FPC, supra note 219, 97 U.S.App.D.C. at 271-272, 230 F.2d at 821-822; Alabama-Tennessee Natural Gas Co. v. FPC, supra note 230, 359 F.2d at 331
 
 
 [237]
 Though unsure as to whether Section 203(e) applied to it, the Public Service Commission of the District of Columbia quite recently has passed the investment credit on to consumers. In re Potomac Elec. Power Co., 64 P.U.R.3d 364, 370-373 (1966)
 Many state regulatory commissions considering the impact of Section 203(e) upon ratemaking, before and after its amendment in 1964, have passed on to the consuming public, in one form or another, all or part of the credit.
 Some commissions have adopted the 'flow through' principle to benefit customers immediately through lowered expenses. Pacific Tel. & Tel. Co. v. California Public Utils. Comm'n, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353, 375-377 (1965); In re Torrington Water Co., 48 P.U.R.3d 1, 5 (Conn.1963); In re New Jersey Water Co., 51 P.U.R.3d 224, 235-236 (N.J.1963); In re Consolidated Edison Co., 56 P.U.R.3d 337, 366-368 (N.Y.1964); In re Chillicothe Tel. Co., 60 P.U.R.3d 270, 274-276 (Ohio 1965); In re Manchester Water Co., 61 P.U.R.3d 295, 299-300 (Vt.1965).
 Other commissions have subscribed to a method by which customers realize the saving over the depreciable life of the properties that made the investment credit possible. City of Pittsburgh v. Pennsylvania Public Utils. Comm'n, 208 Pa.Super. 260, 222 A.2d 395, 402-403 (1965); In re Indiana Water Corp., 50 P.U.R.3d 87, 90 (Ind.1963); In re Citizens Tel. Co., 57 P.U.R.3d 73, 78 (Ky.1964); In re Accounting Procedure for Investment Tax Credit, 61 P.U.R.3d 256, 261-263 (Mich.1965); Pennsylvania Public Utils. Comm'n v. Columbia Gas Co., Inc., 60 P.U.R.3d 385, 413-414 (Pa.1965); In re Inter-Mountain Tel. Co., 59 P.U.R.3d 337, 342-343 (Tenn.1965); In re Kansas-Nebraska Natural Gas Co., 54 P.U.R.3d 184, 193-195 (Wyo.1964).
 At least one commission has held that while the investment credit could not reduce the utility's tax expense, it would lower its rate base harmoniously with the smaller net cost of the acquisition. In re Otter Tail Power Co., 49 P.U.R.3d 305, 311 n. 3 (N.D.1963). In City of Pittsburgh v. Pennsylvania Public Utils. Comm'n, supra, the court upheld the Commission's decision both to pass on the amortized portion of the tax credit in the form of lower expenses and to reduce the rate base in the amount of the unamortized portion.
 
 
 [238]
 City of Chicago v. FPC, supra note 218, 385 F.2d at 636; Cities of Lexington, etc. v. FPC, 295 F.2d 109, 114 (4th Cir. 1961); Alabama-Tennessee Natural Gas Co. v. FPC, supra note 230, 359 F.2d at 330. See also Panhandle Eastern Pipe Line Co. v. FPC, supra note 230, 115 U.S.App.D.C. at 12, 316 F.2d at 663
 
 
 [239]
 See FPC v. United Gas Pipe Line Co., supra note 234; Minneapolis & St. L. Ry. v. United States, supra note 98, 361 U.S. at 186-187, 80 S.Ct. 229, 4 L.Ed.2d 223; FCC v. RCA Communications, Inc., supra note 219; McLean Trucking Co. v. United States, supra note 219, 321 U.S. at 85-88, 64 S.Ct. 370, 88 L.Ed. 1246. Compare City of Chicago v. FPC, supra note 218, 385 F.2d at 635-636; Trans World Airlines v. CAB, supra note 119, 385 F.2d at 666-668; Panhandle Eastern Pipe Line Co. v. FPC, supra note 230; RCA v. FCC Communications, Inc., 99 U.S.App.D.C. 163, 238 F.2d 24 (1956), cert. denied 352 U.S. 1004, 77 S.Ct. 563, 1 L.Ed.2d 549 (1957)
 
 
 [240]
 See the text supra at notes 128 to 130
 
 
 [241]
 As of December 31, 1962, $6,656,748 has been accrued to the account and $1,842,499 expended therefrom. In re D.C. Transit Sys., Inc. (Order No. 245), supra note 2, 48 P.U.R.3d at 395-396
 
 
 [242]
 D.C.Code 47-1571a (1967 ed.)
 
 
 [243]
 This problem did not arise with respect to Transit's federal income taxes. In that connection, Transit employed the accrual method to deduct from its taxable income the amount of the annual increment to the reserve for track removal and street repaving
 
 
 [244]
 Order No. 3592 (unreported) (PUC 1959)
 
 
 [245]
 Ibid., quoted in In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 51
 
 
 [246]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 50
 
 
 [247]
 See the text supra at note 130
 
 
 [248]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 50
 
 
 [249]
 Ibid
 
 
 [250]
 Ibid
 
 
 [251]
 Ibid
 
 
 [252]
 Ibid
 
 
 [253]
 By Transit's computation, its expenses in removing tracks and repaving streets exceeded its District of Columbia taxable income (before such charges) by $537,927 in 1963 and $541.784 in 1964, and an excess of $1,086,258 was estimated for 1965
 
 
 [254]
 Compare Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 220-223, 318 F.2d at 191-194; Transit I, supra note 1, 121 U.S.App.D.C. at 390, 350 F.2d at 768
 
 
 [255]
 In its brief, the Commission states comprehensively the construction it intended for Order No. 564 in this respect:
 'The Commission has at no time made any assumptions as to the relationship between taxable income on a District of Columbia tax return and the amount of expenditure for track removal. * * * The Commission arrived at its decision with a clear understanding of the fact that taxes which had to be paid by the Company at the time of accrual were being deferred on a net-of-taxes basis and that this deferral had to be offset at the time of actual expenditure and deduction from the Company's District of Columbia income tax return. This is what the Commission order proposes. Fulfillment of the order will result in the removal of the deferred tax as expenditures are made. This will permit the $222,000 to be charged to the ratepayer, if, as, and when the expenditures, for which accruals had been made in the Reserve for Track Removal, materialize. * * *
 'The retepayer will be charged directly for the tax as and when the Company expends the money that has been accrued for this track removal purpose. This is true even though in some years the expenditures will exceed the taxable income of the Company on its District of Columbia tax return. The order of the Commission was devised to overcome the difficulty that might otherwise have been faced in clearing out the deferred income tax. The order of the Commission ignores the relationship between the Taxable income on the District of Columbia tax return and the amount expended for track removal, with the express purpose of making certain that as expenditures are made, the deferred tax is plowed back as an expense to the ratepayer.'
 
 
 [256]
 See Mitchell v. Budd, 350 U.S. 473, 480, 76 S.Ct. 527, 100 L.Ed. 565 (1956); SEC v. Chenery Corp., 332 U.S. 194, 207-209, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Cardillo v. Liberty Mut. Ins. Co., 330 U.S. 469, 477-478, 67 S.Ct. 801, 91 L.Ed. 1028 (1947)
 
 
 [257]
 Compare the cases cited in note 145, supra
 
 
 [258]
 Compare the theory underlying the principles discussed in the text supra at notes 160 to 162, 179 to 180. See also the cases cited in note 252, supra
 
 
 [259]
 These costs embraced fuel, lubricants, tires and chassis and body maintenance for Transit's fleet of 1202 buses as of June 30, 1965
 
 
 [260]
 Thus Transit's statistical factor, hereinafter referred to, is the system cost per mile, derived by dividing the total maintenance cost of all buses, regardless of group, by total miles of operation, regardless of group. Compare the Commission's group method of computation, described in the text infra at notes 262 and 263
 
 
 [261]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 55. The difference between Transit's and the staff's respective estimates, as made, was $574,578. Transit's projection, however, took account of an estimated increase of $148,040 in maintenance payroll, an item the staff treated separately. Thus the net difference between the two estimates was $426,538
 
 
 [262]
 Each group consisted of buses of the same model acquired by Transit at the same time
 
 
 [263]
 The staff substituted the 200 new buses for 142 in-service buses with an estimated 1965 maintenance cost of 26.05 cents per mile, and 58 other in-service buses with an estimated 1965 maintenance cost of 15.31 cents per mile
 
 
 [264]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 55
 
 
 [265]
 See the text supra at note 260
 
 
 [266]
 In re D.C. Transit Sys., Inc. (.order No. 564), supra note 12, 63 P.U.R.3d at 55
 
 
 [267]
 It is not for us, at least in the first instance, to measure the extent of the duplication. We recognize, however, that this would depend partly upon how closely operating costs of buses retired during the historical test period compared with the costs of those the Commission's staff eliminated for the future annual period, see note 263 supra, and partly upon the degree of coincidence in the number of buses involved in each period. We observe only that, in consequence of the circumstances recited in the text, some duplication was inevitable
 We also note, in this connection, the average age of Transit's buses is steadily decreasing as a result of the annual infusion of new vehicles. Transit figures denote a reduction from 9.41 years in 1962 to 6.94 at the end of 1965.
 
 
 [268]
 Related to this point is other evidence to the effect that the per-mile cost of operation goes up as the number of miles a bus operates comes down, and that reduced mileage usually accompanies aging
 
 
 [269]
 An expert testified that the staff 'used figures that showed these trends (that increased maintenance expense accompanies againg) right up to the year ending June 30th, (1965,) but somehow, by putting some water in the radiators from the 'fountain of Youth,' (it) managed to stop all that, (it) then went right on through eighteen months without a change.'
 
 
 [270]
 The staff took from Transit's records a per-mile cost of 5.14 cents for operation of these 20 buses, but this was for operation over only 23,000 miles at the very beginning of service when costs are lowest. With this as its base, the staff raised its estimate to six cents flat, exclusive of labor increases in 1966. But compare the data in notes 271 and 272, infra
 
 
 [271]
 By the staff's plan, 100 of the new buses would travel a total of 4,098,030 miles throughout the full calendar year 1966, and these would be 18 months old at the end of the period; and the other 100 buses would travel a total of $2,040,973 throughout the last six months of 1966, and these would be six months old at the end of the period
 
 
 [272]
 By October 30, 1965, actual maintenance costs on the new buses delivered during the previous June and July-- and these were buses the staff estimated six cents per mile would maintain-- had already risen to 7.65 cents per mile. As a matter of long experience, Transit's maintenance costs on new buses during the first year's operation have varied between seven and eight cents per mile at times when labor costs were substantially less than in 1966
 From January 1, 1962, when Transit began an all-bus operation, through June 30, 1965, its system cost per mile, see note 260, supra, ranged from a low of 13.31 cents in 1964 to a high of 13.93 cents in 1962, and was 13.23 cents for the six months ending June 30, 1965. During this period, the system cost per mile decreased an aggregate of 7/10 of a cent, the largest reduction in any year being 4/10 of a cent in 1963. The staff's estimate of six cents per mile, converted to Transit's system cost per mile, would multiply these decreases, as appears from the next paragraph.
 As we have said, see the text supra at notes 262 and 263, the staff computed Transit's bus maintenance cost per mile of operation on a unit basis by groups, and its projected expense did not reflect increased labor costs for 1966, which the staff computed separately. Without the additional labor costs, the staff's computation was 13.10 cents as of June 30, 1965, and its estimate for 1966 was 11.16 cents. Giving effect to the increased labor costs, the staff's projection for 1966 would be 11.61 cents. This would amount to a reduction in 1966 maintenance costs per mile of 1.94 cents, an amount almost three times the cumulative reduction over the previous three and one-half years, and almost five times the largest reduction in a single year since 1962.
 There is no evidence in the record indicating that Transit's historical pattern of maintenance costs was inaccurate, or that it would undergo any dramatic change in 1966.
 
 
 [273]
 Maryland's licensing and tax fees for new 51-seat buses are about $1,200 for the first year and about $200 for each year thereafter. These compare with about $75 per year in Virginia and about $35 per year in the District. Because of these differences, Transit used in Maryland only those buses-- more than one-third of its fleet-- already licensed to operate therein. The staff did not take into account the additional costs of licensing buses in Maryland which its reassignments-- apparently in considerable number-- would require
 In reassigning buses to regular route operations, the passenger capacities of the buses were almost entirely ignored. Thus, in some number of instances, undetermined on the record, it appears, 31-seat buses were reassigned to routes previously served by 51-seat buses.
 
 
 [274]
 This projection resulted in a figure for 1966 bus maintenance costs that was $150,393 higher than the staff's estimate. Thus, the latter estimate of $574,578 less $148,040 for additional labor or a net of $426,538 in savings would be reduced by $150,393 to $276,145 in savings
 Transit made another projection, likewise applying the staff's unit maintenance cost factors to buses properly assigned, but considering also the aging of the buses and the decreased miles of operation of older buses. This, for 1966, resulted in a cost per mile of 1.92 cents higher than the staff estimate, and a total annual maintenance cost $674,478 above that computed by the staff.
 
 
 [275]
 In re D.C.Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 55
 
 
 [276]
 'Transit's original and rebuttal data fails to recognize any savings on account of the new buses in the latter half of 1965 and 1966-- in fact, Transit persisted in adding $41,000 to costs of maintaining air-conditioning units. Transit also failed to consider savings which may result from projected consolidation of operating divisions in early 1966
 'The commission is not unaware of the fact in the last rate case involving D.C. Transit, Transit, by dint of careful management economies, was able to reduce operating costs in 1963 substantially below those projected in Order No. 245.' In re D.C. Transit, Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 55.
 
 
 [277]
 Ibid
 
 
 [278]
 We do not mean to suggest that the Commission was obligated by the record to accept Transit's estimate
 
 
 [279]
 Compact, supra note 9, tit. II, art. XII, 17(a); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [280]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 68
 
 
 [281]
 Id. at 69
 
 
 [282]
 Id. at 67
 
 
 [283]
 Id. at 68
 
 
 [284]
 The Commission's finding was that Transit's debt expense would be 'approximately $960,000,' In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 66. Protestants' expert witness adopted $957,000, the figure set by the Commission's staff accountant
 
 
 [285]
 121 U.S.App.D.C. at 400, 350 F.2d at 778. But see note 34, supra
 
 
 [286]
 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [287]
 See notes 30-33, supra, and accompanying text
 
 
 [288]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 66
 
 
 [289]
 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [290]
 Notes 31-33, supra, and accompanying text
 
 
 [291]
 Transit is the wholly-owned subsidiary of a Delaware corporation, also called D.C. Transit System, Inc. See note 26, supra. For this reason it is presumably the market position of the parent's stock which would be affected by any change in Transit's dividend policy. See note 53, supra. It may be for this reason that the Commission found an appropriate dividend would be '$400,000 to $500,000'-- $500,000 being the annual payout by Transit, and $400,000 being the amount historically passed on to the stockholders of the parent corporation, see note 31, supra,-- without further particularizing its finding
 
 
 [292]
 Apparently, the company's management has seen little need to secure new equity capital in recent years, and has relied almost exclusively on debt financing. See note 60, supra. The Commission did not comment on the testimony of Transit's Vice President that it has been able to secure financing for purchases of new buses without down payments, nor on the significance of its status as a wholly-owned subsidiary of another corporation, see note 291, supra
 
 
 [293]
 Strictly speaking, the integrity of existing capital is impaired only when the company is forced, because of unfavorable earnings, to issue new stock at less than the per-share book value of the old stock. Bonbright, supra note 34, at 249. Whether or not a company should be afforded an opportunity to earn a return high enough to bring some premium over book value for the company's stock, see note 34, supra, even a liberal return should be calculated to do no more than maintain a 'reasonable relationship' between market price and book equity. Bonbright, supra note 34, at 249. In this connection, we note that there is evidence in the record that the 1961 market price of the common stock of Transit's parent, D.C. Transit (of Delaware) was more than 8 times greater than the book equity per share. This 8 to 1 ratio was far greater than that for any of twelve other urban transit companies studied. In fact, only two other companies showed a ratio as high as 2 to 1
 
 
 [294]
 In re Pub. Serv. Co. of North Carolina, Inc., 33 P.U.R.3d 398, 412-413 (N.C. Utils. Comm'n 1960); Wash. Public Serv. Comm'n v. Pacific Tel. & Tel. Co., 100 P.U.R. (N.S.) 309, 320 (Wash. Public Utils. Comm'n 1953); In re Consumers Power Co., 82 P.U.R. (N.S.) 97, 110 (Mich. Public Serv. Comm'n 1950); cf. Cambridge Elec. Light Co. v. Department of Public Utils., 333 Mass. 536, 131 N.E.2d 922 (1956); see In re Tennessee Gas Transmission Co., 24 F.P.C. 204, 207-208 (1960). Compare the Commission's 'stock price stability theory,' discussed in notes 30-33, supra, and accompanying text
 
 
 [295]
 See Potomac Elec. Power Co. v. Public Utils. Comm'n, 81 U.S.App.D.C. 225, 158 F.2d 521 (1946) (opinion of Edgerton, J.), cert. denied 331 U.S. 816, 67 S.Ct. 1303, 91 L.Ed. 1834 (1947); In re Inter-Mountain Tel. Co., supra note 224, 59 P.U.R.3d at 344-345
 
 
 [296]
 In Order No. 684, issued March 13, 1967, the Commission found that, with the return therein allowed, the company would have available 'something less than $430,000 in cash after meeting all other obligations;' and it added that it did not 'anticipate that the entire amount of available cash would be used for dividends,' since the company 'is manifestly in a cash-short position.' Order No. 684, supra note 34. The Commission explained why, despite the fact that 'dividends will probably be at a level significantly lower than in some past years' it felt the return was adequate: 'We do not regard this as requiring a larger return. The substantial risks the company faced in coming into the community at a difficult time and converting to an all-bus operation with a high standard of service may well have dictated a high return of capital in past years. As we look at the company now, however, it faces a more secure future than most transit companies, having a modest but definite growth potential. Dividends on the level which seem possible under our return allowance should adequately compensate the equity holder.' Ibid
 
 
 [297]
 Compact, supra note 9, tit. II, art. XII, 6(a)(3); see note 293, supra
 
 
 [298]
 Transit I, supra note 1, 121 U.S.App.D.C. at 402, 350 F.2d at 780
 
 
 [299]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 61. In addition to its reliance on this witness's opinion that the market place 'assumes' continuation of a $500,000 payment, the Commission said that 'The expert witness for the protestant-intervenor did not agree with Transit as to the requirement for over-all earnings, but he saw an advantage to continuing annual dividend payments at the $400,000 level, being the amount flowing through to the holders of the Delaware company's stock.' Id. at 66. We find no indication in the testimony of protestants' expert that he 'saw an advantage' in a $400,000 dividend. Indeed, though recognizing that payment of dividends 'rests within the sound discretion of mangement,' he suggested that Transit should consider reduction or elimination of dividends in the future annual period, since, despite excess earnings, the undesirably high proportion of debt in the company's capital structure had grown even larger in recent years. He added that if management nevertheless did declare a dividend, 'obviously no greater amount is required than $400,000'-- since that was the amount historically paid to stockholders of the parent, and 'the relevant data for consideration here is the market performance of the parent's stock.' See notes 291, 292, supra
 
 
 [300]
 That this is not what the Commission meant by its statement that the market place 'assumes' continuation of a $500,000 payout is suggested, perhaps by its recommendation, later in Order No. 564, that the company forego payment of a cash dividend and substitute a stock dividend. In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 71
 
 
 [301]
 Transit I, supra note 1, 121 U.S.App.D.C. at 401, 350 F.2d at 779
 
 
 [302]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 66
 
 
 [303]
 See the text supra at notes 48-53
 
 
 [304]
 Though the Commission did make findings as to Transit's book equity, In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 65, and the cost of servicing its debt during the future annual period, see note 284 supra, it never determined the return on equity that would result from the margin of return it authorized. Compare notes 68, 69, supra. Utilizing the Commission's figures for debt expense and book equity, the return afforded to the equity holder by an overall return of $2,000,000 would be nearly 23%. Transit's own exhibit of comparative data showed composite returns on common stock equity for 18 urban transit companies for 1960-1964 ranging from 1.16% To 7.73%. See notes 65-71, supra, and accompanying text
 
 
 [305]
 'Considering the numerous risks attendant upon Transit's operations, when such a return is related to other regulated utilities without similar risks, we feel that 7.4 per cent on Transit's rate base is low.' In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 68. A little more than a year later, however, in Order No. 684, the Commission allowed a return on operating revenues of 5.24% Representing a return on rate base of 6.97%. Conceding that 'both the dollar amount of return and the rate of return on gross operating revenues are substantially less than that allowed only a year ago in our Order No. 564,' the Commission found that Transit 'faces less risk than most transit companies.' Order No. 684, supra note 34
 
 
 [306]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 67
 
 
 [307]
 Ibid
 
 
 [308]
 'An intelligent estimate of probable future values, * * * and even indeed of present ones, is at best an approximation. The like is true of a forecast of the extent of future revenues. There is left in every case a reasonable margin of fluctuation and uncertainty.' Dayton Power & Light Co. v. Public Utils. Comm'n, supra note 161, 292 U.S. at 310, 54 S.Ct. at 656, 78 L.Ed. 1267
 
 
 [309]
 The soundest estimate is one that contains an equal likelihood that the projection will be too large as that it will be too small. If there is no likelihood that a given estimate may be too large but a substantial one that it may be too small, the estimate is unreliable
 
 
 [310]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 67
 
 
 [311]
 Transit's original estimate of total operating revenues for 1966 under existing fares was $32,698,774. In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 52. The Commission's staff projected $253,797 more in regular route revenues and $410,000 more in charter revenues than had Transit. Id. at 53. Transit acquiesced in the adjustment for charter revenues, disputing only the increase claimed for regular route operations. Ibid. The Commission revised downward the staff's estimate of the latter, reducing the difference between the Commission's estimate of total operating revenues and Transit's to only $173,000. Ibid
 
 
 [312]
 At the commencement of the 1965 rate hearing, neither the Commission's staff nor Transit had the full results of Transit's 1965 revenue experience from which to project 1966 revenues. Transit therefore based its revenue estimate for 1966 on revenues earned for the year ending June 30, 1965. However, before the Commission issued Order No. 564, it had before it the complete revenue experience for 1965. Transit's regular route reveenue for the year ending June 30, 1965 was $29,837,656, and for the calendar year 1965 was $30,183,559. In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 52-53
 
 
 [313]
 In estimating regular route revenue for 1966, Transit assumed an 'average increment of ridership of 2.3% In (the) ensuing year.' It applied this figure to revenue and passenger experience for the year ending June 30, 1965, in order to determine anticipated revenue for 1966. See note 312, supra. Though the Commission's estimate was based on figures for the year ending December 31, 1965, thus taking into account the increased revenues in the latter half of 1965, see note 312, supra, it projected an increase in regular route revenue for 1966, over 1965 levels, of only 1.8%. Thus, had Transit's assumed growth figure of 2.3% Been applied to actual revenue experience for the full calendar year 1965, the resulting estimate of regular route revenue for 1966 would have been significantly higher than that estimated by the Commission
 
 
 [314]
 One of the contingencies cited by the Commission in justification of the 'cushion' was that 'a mere 1% Drop in passenger revenues under that projected by the Commission could result in a reduction of approximately $300,000 in collections in 1966.' In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 67. But it is also true that a mere 1% Growth in revenue would represent an increase of $300,000 and, if anything, the record tends to suggest this latter possibility as the more likely
 
 
 [315]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 67. The record indicates, contrary to this assertion, that estimates of track removal expenses were likely to prove overgenerous. In 1965, track removal expenses were $702,000 less than had been projected. In explaining the delay in completion of planned track removal projects, an official of the Highway Department explained: 'The problem in this construction, as in all constructions, you make your schedule and you try very hard to maintain your schedule, but you always have to figure there is going to be some slippage.' The Commission, in dealing with the adequacy of the Reserve for Track Removal for 1966, noted the 'considerable slippage possibilities in timing the projects.' In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 51
 
 
 [316]
 Ibid
 
 
 [317]
 Michigan Wisconsin Pipeline Co. v. FPC, supra note 118, 263 F.2d at 555
 
 
 [318]
 American Overseas Airlines v. CAB, 103 U.S.App.D.C. 41, 47, 254 F.2d 744, 750 (1958)
 
 
 [319]
 See Transit I, supra note 1, 121 U.S.App.D.C,. at 400, 350 F.2d at 778. See also note 34, supra
 
 
 [320]
 FPC v. Hope Natural Gas Co., supra note 38, 320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. 333
 
 
 [321]
 The result of granting Transit a cushion of $550,000 to $650,000 over and above estimated operating expenses was to give it a return of 7.4% On its rate base and 6.03% Of its operating revenue. The operating ratio of 6.03% Was even higher than the 5.88% Requested by Transit, and substantially higher than Transit's average operating ratio of 4.24% For the years 1959-64. In only one of these years did Transit's operating ratio exceed this amount. The return of 7.4% On rate base is substantially higher than Transit's average return from 1956-65 of 4.93% And higher than in all but one of those ten years. See also note 311, supra
 
 
 [322]
 See FPC v. Natural Gas Pipeline Co., supra note 38, 315 U.S. at 597- 598, 64 S.Ct. 281, 88 L.Ed. 333; Driscoll v. Edison Light & Power Co., 307 U.S. 104, 120, 59 S.Ct. 715, 83 L.Ed. 1134 (1939); Pennsylvania Water & Power Co. v. FPC, 89 U.S.App.D.C. 235, 247-248, 193 F.2d 230, 242 (1951), aff'd 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042 (1952); Washington Gas Light Co. v. Baker, supra note 94, 88 U.S.App.D.C. at 123-124, 188 F.2d at 19-20; City of Pittsburgh v. Pennsylvania Public Utils. Comm'n, 178 Pa.Super. 46, 112 A.2d 826, 837 (1955)
 
 
 [323]
 The Cimmission advanced no basis whatsoever for its choice of the figure '$550,000 to $650,000,' other than the fact that that amount approximated the sum remaining in the court ordered reserve, see In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 68-69
 
 
 [324]
 Note 90, supra
 
 
 [325]
 Notes 87 to 96, supra, and accompanying text
 
 
 [326]
 Notes 110 to 114, supra, and accompanying text
 
 
 [327]
 In any event, we do not think the amount of restitution required by our disposition of Order No. 564 could be greater than the amount transferred from the court ordered reserve. It is true that the fares collected by Transit during the effectiveness of Order No. 564 were those prescribed initially by Order No. 245, and that we have set that order aside. Nevertheless, having suspended Transit's proposed tariff and having entered upon a hearing on the justness and reasonableness of the higher fares requested, the Commission in denying the fare increase prescribed a new schedule of 'lawful fares . . . to be in effect,' though the fares so prescribed were those previously in effect. Compact, supra note 9, tit. II, art. XII, 6(a)(2). That aspect of Order No. 564 was not challenged by petitioners-- i.e., they did not claim error in the Commission's failure to reduce fares. See Compact, supra note 9, tit. II, art. XII, 16. And the relief requested in this court is 'restitution of amounts withdrawn from' the court ordered reserve. See also note 121, supra; notes 329-333, infra, and accompanying text
 
 
 [328]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 58
 
 
 [329]
 In speaking of the 'protestants' herein we refer not only to petitioners Bebchick and Gottlieb, and the other individuals who were parties before the Commission but have not joined in this appeal, but also to petitioner Democratic Central Committee which appeared before the Commission as intervenor
 
 
 [330]
 In re D.C. Transit Sys., Inc. (Order No. 564), supra note 12, 63 P.U.R.3d at 62
 
 
 [331]
 Ibid
 
 
 [332]
 Notes 114, 115, supra, and accompanying text
 
 
 [333]
 Note 284, supra, and accompanying text
 
 
 [334]
 Petitioners, in their petition for reconsideration of Order No. 564, contended that 'the Commission erred in failing to conclude that a fair return for Transit in 1966 would fall within the range of $1,500,000 and $1,550,000.'
 
 
 [335]
 See the text supra at notes 18-21
 
 
 [336]
 Protestants' expert recommended a return of $1,107,000, see note 47, supra. Evidence in the record suggests that Transit's net operating income was $2,133,331 for 1963, $1,127,859 for 1964, and $975,806 for 1965
 
 
 [337]
 All funds to be deposited in the court-ordered reserve are to be employed by the Commission in the manner and for the purposes described in Bebchick v. Public Utils. Comm'n, supra note 15, 115 U.S.App.D.C. at 232-233, 318 F.2d at 203-204. See the text supra at note 194
 
 
 [338]
 See Washington Gas Light Co. v. Baker, supra note 88, 90 U.S.App.D.C. at 104-105, 195 F.2d at 35; S. W. Bell Tel. Co. v. Kansas City Corp. Comm'n, supra note 120, 53 P.U.R.3d at 338
 
 
 [339]
 As of August 31, 1966, Transit's net operating income for the year, including an annualized 8/12 portion of the credit from the court-ordered reserve, was $1,318,557. Projected over the remaining months, this would represent net income for 1966 of approximately $1,978,000